STATE EX INF. RUSSELL MALLETT, EX REL. EDGAR WOMACK ET AL. V. CITY OF JOPLIN, Appellant.—62 S. W. (2d) 393.

Division One, June 12, 1933.*

R. A. Pearson and Norman Cox for appellant.

*NOTE: Opinion filed at October Term, 1932, April 20, 1933; motion for rehearing filed; motion overruled at May Term, June 12, 1933.

1194

*Russell Mallett, Foulke & Foulke, Roy Coyne* and *S. W. Bates* for respondents.

HYDE, C.—This is a *quo warranto* action, commenced by the Prosecuting Attorney of Jasper County at the relation of certain interested landowners, to oust the city of Joplin from certain territory over which it had assumed jurisdiction in 1929, under Section 1, of ordinance No. 15162 of the city extending its boundaries. The contention of the relators was that this extension of the city's boundaries was "wholly unreasonable, unnecessary for any city purposes whatsoever, unjust, illegal and invalid, not attempted in good faith . . . and of no benefit whatsoever to said territory included." The circuit court upheld the relators' contention and entered a judgment of ouster against the city. The city appealed to the Springfield Court of Appeals and that court reversed the judgment. [State ex inf. Mallett v. City of Joplin, 52 S. W. (2d) 602.] Upon motion for rehearing, one of the judges dissented and the cause was certified here under the provisions of Section 6 of Amendment of 1884 to the Constitution.

It was shown that the last prior extension of the boundaries of the city was made in 1908. Prior to that time the city extended north from the Jasper County-Newton County line to Turkey Creek, a distance of almost four miles at the longest place. The width, east and west, was about two and one-fourth miles. In 1908 the city limits were extended both east and west. On the east three sections were added, making a strip a mile east and west and extending three miles north from the county line. On the west an extension of the same dimensions was made except that a 120-acre strip, now sought to be included, was not taken in then. The strip on the west included the west three-quarters of the sections, into which the city already extended a quarter of a mile, and a quarter of a mile strip off of

the east side of the next row of sections, with the exception of the above-referred to 120 acres. This extension of 1908 made the city four and a quarter miles wide, from east to west. The following plat (not drawn to scale) shows the location of the city limits prior to and after 1908, as well as the tracts annexed in 1929.

The extension of 1929 here contested involved three tracts:

First, Section 36 of Township 28, Range 33, at the northeast corner of the city. The section lay immediately north of the three sections added to the city on the east by the extension of 1908, so that by adding it the west side of the city extended four miles north from the Newton County line. The small northeast corner of the section south of it cut off by Turkey Creek, not taken in 1908 was also included.

Second, the Northwest Quarter of Section 7, Township 27, Range 32. This quarter section adjoined the east boundary of the city as fixed in 1908. Its north boundary was two miles north of the Newton County line, so that its northwest corner was exactly half way between the Newton County line and the north boundary of the city as fixed by the 1929 extension.

Third, the east half of the northeast quarter and the northeast

quarter of the southeast quarter of Section 8, Township 27, Range 33. This was the part of the quarter mile strip on the west side of the city not included in the 1908 extension.

The proposition to include these three tracts received the majority vote, of the voters voting at the election held in the city for that purpose June 18, 1929. There were two other propositions voted on at that same election but they are not involved in this suit. One was to exclude an area in the north part of the city; the other involved a tract in Newton County contested in another suit. [Schildnecht v. City of Joplin, 327 Mo. 126, 35 S. W. (2d) 35, 41 S. W. (2d) 590.] The facts brought out in evidence about each of the tracts here involved are fully stated in the opinion of the Court of Appeals as follows:

"Section 36, Township 28, Range 33.

"The Section 36 (in which all of relators live) lies at the northeast corner of, and is adjacent to, the city limits (as they existed prior to the extension) along the entire southern boundary (one mile) of the section, and, on the west, adjacent to the city along approximately the south one-sixth of the western boundary of the section.

"It has direct street railway connection with the city proper by street railway leaving Joplin on High Street, past Hill Crest Addition in Section 35, and into Section 36 some seven or eight hundred feet north of its southwest corner, thence diagonally through the southern half of the section (along Castle Rock and through Royal Heights Addition) to Archer Crossing near the center of the north line of the Section.

"Its principal direct highway connection with the City proper is by the concrete paved highway on which is located both U. S. Highway 66 and 71, constituting the principal northeast highway out of Joplin and being known as the 'Main Street of America.' This highway leaves the principal business street in Joplin, eastward over Broadway through the oldest built-up portion of the city to St. Louis Avenue, a north-south street in the city along the west line of Section 1, thence north over St. Louis Avenue into Section 36, crossing Turkey Creek some 650 to 700 feet north of the southwest corner of the section, thence northeast along Euclid Avenue, paralleling the street car tracks, along Castle Rock Addition and through Royal Heights to Broadway in Royal Heights, thence east over Broadway to Kings Highway (a north-south highway through Section 36 at Archer Crossing). Along the west line of Section 36 is a gravel road (a continuation of St. Louis Avenue) which intersects a gravel road along the north line of the Section. Sixth Street (apparently Seventh) an east-west street in Royal Heights, passes through Midway Subdivision and into this graveled road on the west line of the Section.

"Embraced with this section are: The recorded plat of Royal Heights, comprising 150 acres divided into blocks which in turn are divided into lots of 50 by 100 feet, with named and numbered streets and cross-streets; the recorded plat of Castle Rock Addition comprising about 87 acres, similarly divided into blocks and lots of like size, with named and numbered streets and cross-streets; the recorded plat of Midway subdivision, comprising 20 acres, similarly divided into blocks and lots, with named and numbered streets and cross-streets; Miller's subdivision, comprising 20 acres, originally divided into acre tracts, but subsequently subdivided into smaller lots by individual owners; the recorded plat of Shaner Park Acres, comprising 25 acres, divided into lots somewhat smaller than an acre; Nace Subdivision, comprising approximately six acres, divided into lots approximating one-half acre.

"Another tract of 101 acres was, a few months before the institution of this action, platted and subdivided into blocks and lots, adjoining and conforming to Royal Heights, and known as Royal Heights Subdivision, with designated parks and named and numbered streets. The plat was not recorded. It was very desirable and laid out into city lots. It was platted with the idea it was adaptable for selling out like Royal Heights, for residences, but the promoter did not have the money to carry it out, and disposed of the tract in a body.

"The northwest forty acres of the Section is unplatted. The principal owner of it has entertained the idea of platting it, if he could buy out the interest of the parties owning it with him.

"Various other parts of the Section have been subdivided into small tracts, from an acre upward, by different parties. Approximately three-fourths of the section has been platted into city lots or into small tracts ranging from one-half acre upward.

"In the Midway, Royal Heights, and Castle Rock Additions, the families average two or three lots each.

"The streets, while dedicated, marked and named or numbered, and some of them graveled at one time, are not highly improved.

"The schools extend only to the eighth grade, pupils of high school age attending high school in Joplin and some in Webb City, paving tuition.

"The testimony is that some of the families came, originally, from Joplin, and the rest from all over—Oklahoma, Texas, Webb City, Alba, Neck City, Oronogo, Carl Junction, New York, Kansas, Iowa, and Arkansas. About 40 per cent of the people work in Joplin and the rest elsewhere.

"Some of the families in Royal Heights and Castle Rock are supplied with water from a deep well and small water system operated by one. Webster, while others get their water from their own wells, there being about 28 private wells in the additions.

"There are no fire hydrants and no fire protection. The Joplin fire department is called in case of fire—sometimes the Webb City department. Several years ago, an attempt was made to get the utility company furnishing water to Joplin to extend its mains into these additions by the people thereof, but without success.

"Carrier routes are maintained in these additions by the Joplin papers. The people get their telephone, electric and gas service from utilities in Joplin, and pay their bills for the same in Joplin.

"The additions have no sewer system, but private individual septic tanks are employed. The drainage of the land is into Turkey Creek, which is a sewer outlet for Joplin, and the Joplin sewer system already enters the section, and sewer connection therewith for the additions would be feasible.

"Calls are made on the Joplin police force in case of disturbances. (There was also evidence that there were 386 houses and a population of 1134 people in this 640-acre tract.)

"The Northwest Quarter Section 7, Township 27, Range 32.

"This quarter section is adjacent to the city boundary at about the center of the east boundary, the entire west line of the quarter section coinciding with the east line of the city. It is seven-eighths platted into lots with streets and cross-streets dedicated. The entire quarter-section, with the exception of two tracts, approximating nine acres each, owned by two individuals, is subdivided into five plats of record, and is bounded on the north by Seventh Street extended, and on the south by Thirteenth Street, extended.

"Seventh Street, bordering the quarter-section along its entire north line, comprises the principal east highway into the city, and is concrete slab, running directly into U. S. Highway 66 at Seventh and Main streets in Joplin and continuing on eastward to Carthage and Sarcoxie.

"Of the five platted additions in the quarter-section, Hatten's Addition, occupying the northwest forty is divided into 156 lots, mostly 50 by 196 feet in dimensions, but with smaller lots along the west along Range Line Road, which is the old city boundary. Hatten's Section Subdivision covers the west half of the southwest forty and is divided into lots numbering 47 and varying from 100 to 175 feet to 100 by 200 feet. Shepherd's two additions occupy the southeast forty and comprise some 36 lots of 195 by 200 feet. Oak Ridge subdivision occupies the northeast forty and is divided into 72 lots approximating 100 by 200 feet.

"A line of the street car system cuts along this quarter-section leading into the city.

"The testimony is that there are 85 families resident in this territory, Park Haggart, witness for relators, stating that 38 of these families came originally from Joplin and others from outside the city,

and that 26 families have employment in Joplin. The section is served by lights from the Empire District Company in Joplin, and with telephones from Joplin, and by carrier service with the Joplin papers.

"The quarter-section has no high school, the children attending high school in Joplin, with some few attending in Duenweg.

"George Kelley, witness for relators, testified that there was nothing to distinguish the Hatten Addition across the Range Line from the Addition on the west side (Villa Heights in Joplin) as far as the city appearances go.

"Mr. Hatten, witness for relators, testified that he first tried mining the land occupied by the Hatten additions, but without success, and platted it and put it on the market in 1911. That they tried at that time to get the city to extend its limits so as to incorporate this territory so as to get city water, but without success That they tapped the city water supply at Seventh and Range Line, installing the main themselves, but that the water supply is not adequate.

"Just prior to the annexation, an attempt was made on the part of many of the inhabitants of this territory to incorporate it, and other territory, as a village, but as it adjoined Joplin they could not do so.

"Villa Heights Addition, in Joplin, just across the Range Line and adjoining this quarter-section, has been one of the most rapidly developing sections of the city in recent years, its greatest development, and the development of this quarter-section having taken place since the last extension of the city limits in 1908. (There was also evidence that there were 102 houses and a population of 354 people in this 160 acre tract.)

"The East Half of the Northeast Quarter and the Northeast Quarter of the Southeast Quarter of Section 8, Township 27, Range 33.

"The above territory, comprising three forties or one hundred twenty acres, is a wedge extending into the west boundary of Joplin extending from Seventh Street to Seventeenth Street, being a rectangle indented into the west city boundary for one-quarter mile for a distance of three-quarters of a mile. The inclusion of this territory in the city limits straightens out the west boundary of the city. The tract lies just across Seventh Street from Shifferdecker Park, one of the largest and finest parks of the city and a park frequented by the entire district. It is bounded on the east by Shifferdecker Avenue, which is paved with concrete in front of the park but is macadam in front of this tract. Seventh Street, along the north side of the tract, is concrete slab and is U. S. Highway 66 running into Kansas and Oklahoma. Thirteenth Street is extended through the

tract and is gravel or macadam. The city Municipal Aviation Field lies to the west of the tract. Highway 66 along the north of the tract is the principal west highway into the city.

"Some seventeen acres off of the north side of the tract, a joining Seventh Street, is owned by the Empire District Electric Company, and on this is located a substation of that company and a switch track.

"Immediately east of Shifferdecker Park is the Leonard Addition to the city platted into city lots and built up along Shifferdecke Avenue, Fourth Street and Seventh Street. North of this part is Chitwood, a built-up portion of the city across the street from this tract, at Seventh Street a filling station is located on the corner, but the land immediately east of the tract is not built upon for about one-fourth mile east, where the Sergeant Addition, platted some twenty years ago, sets in, and from there on eastward, the city is solidly built up."

The following additional facts with reference to Section 36, Township 28, Range 33, concerning which the principal contention of unreasonableness is made, are stated as follows, in the dissenting opinion in the Court of Appeals:

"The census figures show that Joplin had a population of 32,073 in 1910, which had decreased to 29,902, in 1920, and the population has not materially increased since. The record shows that the City, as now constituted, contains an area of about 9,000 acres of which about 5,000 acres are undeveloped and unoccupied, much of which is adaptable and desirable for city uses. While Joplin was a rapidly growing city at one time, there is no such expansion at present. These general conditions must be admitted.

"Referring more specifically to the facts as to the reasonableness of including Section 36 within the city limits, it appears that Section 36 contains several developments and subdivisions connected to the city of Joplin by a concrete highway, a part of the State Highway system and known as U. S. 71 and U. S. 66, which Highway, is the principal connecting road between Joplin and Webb City and from there continues on to Carthage and other cities. There is also an interurban street car line which connects Joplin with the outlying subdivisions in Section 36 and likewise continues on to Webb City and points east. This square mile of territory, however, is separated from Joplin by Turkey Creek. On account of the topography of the lands on either side of Turkey Creek, it appears that this section could never be connected with the Joplin sewer system. (They would have a common outlet.) It further appears that its most thickly settled region is at the north side and about a mile and a quarter from where the houses begin in Joplin, and about the same distance from Webb City's southern limits; there is no fire protection

afforded by Joplin and no police protection or apparent need of any; Oakland and other developments to the east and north of Section 36 are thickly settled in spots, but were not included in the proposed extension although, if the ordinance is reasonable, there would appear to be no reason for stopping where the ordinance did stop.

"The communities involved have their own school system, water and other conveniences; they obtain electric current from the Empire District Electric Company, a private corporation with headquarters in Joplin; there is a vast expanse of unoccupied territory between the settled portion of the section and the settled portion of Joplin; the street car fare is five cents to Webb City and eight cents to Joplin; when fires have occurred at times both Webb City and Joplin Fire Departments have responded; the proposed addition will divide a school district, leaving out Oakland and one of the schools; houses are built mostly on one and two acre tracts and some on much larger tracts; while the section is platted, there is no proof it was held for town lots or that it had any high value except along the concrete road; there are practically no improved streets, except the main highway; about 40 per cent of the people living in the district are employed in Joplin and 60 per cent employed elsewhere; between the settled portion of Joplin and Section 36, is a large vacant grove known as 'The Cox land,' a cemetery south of Turkey Creek, the new stock yards and much other vacant lands."

The statute, Section 6483, Revised Statutes 1929, under which the city as Joplin acted, provides:

"The council of such city, with the consent of the majority of the legal voters of such city voting at an election therefor, shall have power to extend the limits of the city over territory adjacent thereto, and to diminish the limits of the city by excluding territory therefrom, and *shall, in every case, have power, with the consent of the legal voters as aforesaid, to extend or diminish the city limits in such manner as in their judgment and discretion may redound to the benefit of the city.*"

This is a broad grant of discretionary power. As stated in the opinion of this court, in leading cases of State ex inf. Major v. Kansas City, 233 Mo. 162, l. c. 195, 134 S. W. 1007:

"It is no province of the court to substitute its own judgment of what would be the best or most advisable line for the extended limits; it is not its province to subtract or add to the territory selected by the municipality to be annexed; its sole duty is to examine the extension as actually attempted and to say whether it should remain. In short, the court is passing, in a purely judicial manner, upon the validity of an act legislative in its nature."

In the Kansas City case, this court adopted, as its opinion, the con-

clusions of law of the commissioner, which it appointed, now one of Missouri's most distinguished members of the Federal judiciary, Judge KIMBROUGH STONE. The authorities of this and other states are there compiled and reviewed and every conceivable situation which justifies extension of city boundaries suggested. It is unnecessary to go over these authorities, but the following quotations from that opinion are particularly applicable here:

"On one hand it may be said that limit extensions are, and should be, infrequent, and therefore the city should be permitted to look ahead and provide for the development of several years at least. On the other hand, the city should not be permitted to reach out and subject lands which are not clothed with any city uses to city burdens long before the city gives in return any substantial benefit. . . . If land near a city is being held for prices far above any rural use, and men in that city are willing to pay for it prices far in excess of any rural use, that land is as fairly within the future development of the city as the judgment of those who are most interested can place it. . . .

"The mere fact that land near a city is worth more than it would be if away from the city is of no importance. Farming, gardening and dairy land is more valuable if near its market—the city. The value which comes from mere proximity of agricultural or pasture to a city is not taken account of. [Courtney v. Louisville, 12 Bush, 419 (Ky. 1876).]

"But if beyond and above this mere 'proximity value' of agricultural or pasture land, the land has a value which is far in excess of that of any agricultural or pasture land no matter how favorably situated, then the land has lost its character as country land. The city has given it a position which the city gives solely to its own. It has become valuable as city property and as such property it must share the burdens of the city."

Relators admit "that the courts will not and cannot review the exercise of delegated discretionary power by a subordinate body." They say, however, that they will "review the results of the exercise of such power in its reasonableness, unreasonableness or abuse." They say "that taking the whole evidence in this case it fails to show that there is any reasonable ground to include territory." They also say, and the dissenting opinion says, that *quo warranto* is an action at law; that, therefore, the finding of the trial court on questions of fact (referring to the finding that the extension of boundaries was unreasonable), when supported by substantial evidence, is binding upon the appellate court; and that the facts stated in the dissenting opinion which are hereinabove set out amount to "substantial evidence to uphold the decision of the trial court in finding as a matter of fact that the ordinance was unreasonable."

■ While these statements of the applicable rules of law are correct, the application of them here misconceives the real question of fact before the trial court. It was not for the trial court to decide whether, upon the facts shown to exist, the extension of the boundaries was necessary, but to determine whether or not, upon the facts shown to exist, reasonable men would differ as to the necessity of the extension. If the question of whether or not the territory involved should be included within the city limits was fairly debatable, that is, if there was substantial evidence each way so that reasonable men would differ about its necessity, then the decision of that question was for the city council and the city electorate and not for the court. When the evidence shows a fairly debatable question about the matter, then neither way the question might be decided would be unreasonable. On the other hand, if there was substantial evidence tending to show that there was no fairly debatable question about it and that reasonable men could not differ about it but would have to agree that it was not necessary to annex the territory, then a trial court's finding that it was unreasonable, would be binding (in spite of testimony to the contrary) and would have to be sustained. Various conditions to be considered in determining reasonableness under different circumstances have been enumerated but this is the substance of the rule stated by all of our authorities in such cases. [Copeland v. City of St. Joseph, 126 Mo. 417, 29 S. W. 218; State ex inf. Crow v. Fleming, 158 Mo. 558, 59 S. W. 118; State ex rel. Musser v. Birch, 186 Mo. 205, 85 S. W. 361; Hislop v. City of Joplin, 250 Mo. 588, 157 S. W. 625; State ex inf. Major v. Kansas City, 233 Mo. 162, 134 S. W. 1007; State ex inf. Lashly v. City of Maplewood (Mo. App.), 193 S. W. 989; Winter v. City of Kirkwood (Mo. App.), 296 S. W. 232; Boals v. Garden City (Mo. App.), 50 S. W. (2d) 179.]

■ The facts stated in the dissenting opinion were sufficient to be substantial evidence that there was no necessity for the city to extend its boundaries at the present time and take in this territory. That presented a question for the city council and the voters to decide. They were not sufficient to be substantial evidence that there was no fairly debatable question about the matter and that reasonable men could not differ about it, which was the question for the court to decide. We think it appears from relators' own evidence that the necessity of this annexation was at least a debatable question about which reasonable men would differ.

An illustrative case of an extension of boundaries where there was substantial evidence tending to show unreasonable action, is Stoltman v. City of Clayton, 205 Mo. App. 568, 226 S. W. 315. There, a city attempted to take in a tract of 1025 acres of agricultural land, upon which were located only forty-six houses (average of twenty-two acres per house; in the present case the average is less than two acres

per house in Section 36), three years after having annexed 1,000 acres upon which only ninety-two houses were located. The only town purpose, which it was shown this annexation could accomplish, was to provide sewer outlets and it contained at least three times the amount of land needed for that purpose. It was further shown that its settlement and value came not from the city of Clayton of less than 2,000 population, but from the great city of St. Louis just beyond. It was also shown that the boundaries attempted to be established only went to the edge of the county roads on each side of the tract but did not include them, in order to escape the obligation of maintaining them; and that the tract was bounded on one side by the much larger city of University City, which it was feared would soon annex the territory. The St. Louis Court of Appeals said: ''The fear that another city might seek to annex territory here involved partakes more of the vision of the rival's growth than that of Clayton's;'' and it properly sustained the finding of the trial court that the extension was unreasonable. It is clear that there was, there, substantial evidence tending to show that there was no fairly debatable question of necessity but that on the contrary, reasonable men could not differ upon the proposition that the extension attempted was unnecessary; tending to show that it was not made in good faith because of growth of the city or other proper municipal purposes; and tending to show that it was not the result of the determination of a fairly debatable question, but was arbitrary and therefore unreasonable.

That is not the situation disclosed here. While the evidence showed a decrease of the population within the old boundaries of the city from 1910 to 1920 of about 2,000, it is not without significance that almost 1,500 people live on two of the annexed tracts. How many live on the larger tract in Newton County was not shown. The population of Section 36 alone is equal or greater than that of many Missouri county seat towns. It is true that there are areas, particularly in the north, northwest and southeast parts of Joplin, which are not filled up, but it was shown that many of the districts in these sections are or have been used for mining purposes or are not desirable for residences because of the location of railroad tracks over them. Perhaps for those reasons it was proper at one time to include them within the boundaries of the city and perhaps, because of changed conditions, it would be proper now to exclude them. A proposition to exclude some of them was passed by the council but rejected by the voters.

Because people will not build homes in these districts, we cannot say that the city is foreclosed from annexing the adjacent territory where people do live. Modern means of transportation tend more and more to extend the area within which a given population will

reside. It really seems that Joplin instead of decreasing in population was actually only changing its shape. In mediaeval times it was both necessary and proper for defense against enemies to keep cities within small areas surrounded by high walls. Now a city cannot and should not attempt to control the direction of its growth, nor the location of the homes of its citizens, except, perhaps, by proper zoning to provide the best conditions for sanitation, fire and police protection, recreation, and future development for the various parts of its territory. That is, no doubt, the underlying reason for our Legislature giving the wide discretion it did to city councils, in the matter of taking in additional territory. In modern times, population is distributed with reference to means of transportation. In the early part of the last century, population was located with reference to facilities for steamboat navigation. More recently, it has followed the lines, first, of steam railroads, and then electric street railways and interurban lines. At the present time, it has begun to conform to the location of paved highways. That seems to be what has happened in all of the tracts involved here and also in the land annexed in Newton County. The evidence in this case shows that there is, both a Federal and State highway, east and west through Joplin on Seventh Street. The territory added to the city, on both its east and west boundaries, is located upon this thoroughfare. It is also shown that running through Joplin and traversing the square mile of territory, added on the northeast, are two important Federal highways, one of which is modestly called by the people of that enterprising community "the Main Street of America." This section is also served by an electric street railway line.

We certainly cannot agree with relators that, with all these facts in the record, the evidence "fails to show that there is any reasonable ground to include territory." Neither can we conclude that Turkey Creek constitutes a barrier which the city shall not pass. It may be that there is land along this stream, which will never be desirable for residential purposes, but as said in the Kansas City case "it may have been needed for town purposes, and it may have needed organized local government to reclaim the low, wet parts, and fit it for town uses. Such places are thus reclaimed in the ordinary course of town improvements, and become centers of population and business activity." Moreover, since both Section 36 and the city sewers drain into it, improvement and drainage may now be or soon become necessary for sanitary purposes to eradicate breeding places of insects and diseases. [State ex inf. Lashley v. Maplewood (Mo. App.), 193 S. W. 989.] We therefore hold that the evidence clearly shows that there was before the city council and the voters a question concerning the necessity of the annexation of the territory in controversy which was at least fairly debatable and about which rea-

sonable men, at least, would differ, and that there was no substantial evidence to show that the action of the city in including these tracts was so arbitrary, unjust, and unreasonable as to amount to abuse of the discretion which the statute delegated to it.

The judgment is reversed. *Ferguson, C.,* concurs; *Sturgis, C.,* not sitting.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.