**Russell WALLER et al., Respondents,**

v.

**CITY OF MACON, Appellant.**

No. 22080.

Kansas City Court of Appeals. Missouri.

March 21, 1955.

Paul D. Hess, Jr., City Atty., David Collins, Macon, for appellant.

John T. Barker, Kansas City, for respondent.

BROADDUS, Judge.

This is a suit in equity brought by Russell Waller and eleven other individuals, as plaintiffs, against the City of Macon, as defendant, to have declared void an extension of the city limits of said city, and to enjoin the latter from exercising any municipal authority over the annexed territory. The Wardell School District No. 88 was permitted to intervene as a party plaintiff. The trial resulted in a finding and judgment against the City. The latter appealed.

Defendant is a city of the third class and is located on the south side of U. S. Highway No. 36, and on both the west and east sides of U. S. Highway No. 63. During April, 1950, the Mayor and Council of Macon considered the matter of extending the city limits. And on July 17, 1950, a committee was appointed by the Mayor to study the question and make recommendations to the Council. "Several open meetings" were held. At one of these council meetings, that of February 5, 1951, four of the plaintiffs herein "addressed the Council

* * * protesting the extension of the city limits to include their property."

On August 6, 1951, the Council passed Ordinance No. 45–B, calling for the submission of the proposed extension to the voters of the City. Inasmuch as it is claimed by plaintiffs that the description of the area sought to be annexed "is so bad that it will not support a judgment," we here set out the first page of the ordinance.

"An ordinance authorizing the extension of the City limits of the City of Macon, Macon County, Missouri, by extending said City limits to include the following described lands, situate, lying and being in the County of Macon, State of Missouri, to-wit:

"Beginning at a point on the East City Limits of the City of Macon, Missouri at the Southeast corner of the Southwest quarter (SW¼) of the Northwest quarter (NW¼) of Section Fifteen (15), thence North on the East line of the West half of the Northwest quarter (NW¼) of Section fifteen (15) to the north line of Section Fifteen (15), thence East on the north line of Section Fifteen (15) to the Northeast corner of the Northwest quarter (NW¼) of Section Fifteen (15), thence North Five hundred thirty (530) feet to a point on the East line of the Southwest quarter (SW¼) of Section Ten (10), five hundred thirty (530) feet North of the South line of Section Ten (10), thence West on a line five hundred thirty (530) feet North of and parallel to the South line of Section Ten (10) and Section Nine (9) to the West right-of-way line of the Wabash Railroad, thence, in a southwesterly direction along the West right-of-way line of the Wabash Railroad to the North line of Section Sixteen (16) which intersection is on the present city limit line.

"Also beginning on the East line of the Northwest quarter (NW¼) of the Northwest quarter (NW¼) of Section Sixteen (16) and the intersection of the new right-of-way line of United States Highway No. 36; thence Southwesterly along the new South right-of-way of United States Highway No. 36 to a point on the South right-of-way line at Station 1079/50; thence West to West line of the Northeast quarter (NE¼) of Section Seventeen (17), thence South on said quarter line to the Southwest corner of the Northeast quarter (NE¼) of Section Seventeen (17), thence East along the South line of the Southwest quarter (SW¼) of the Northeast quarter (NE¼) of Section Seventeen (17) to the Southeast corner of said Southwest quarter (SW¼) of the Northeast quarter (NE¼), thence South along the West line of Northeast quarter (NE¼) of the Southeast quarter (SE¼) of Section Seventeen (17) to a point 500 feet South of the South right-of-way line of the Spur to United States Highway No. 36; thence in an Easterly and Southeasterly direction at a distance of 500 feet from and paralleling the South right-of-way line of the Spur to United States Highway No. 36 to the East line of Section Seventeen (17) at the present West City limits.

"All of the Sections above mentioned being in Township Fifty-seven (57) Range Fourteen (14) West."

Thereafter the "Mayor's Proclamation and Notice of Election" was published. In this publication an error appeared in the second paragraph of the description of the extension where a highway station "1079+50," which was indicated in Ordinance 45–B as "1079/50," was published as "1079–50." According to the evidence, highway "station 1079" means that the engineers "in starting their survey run in one direction and every 100 feet they mark off a station, and then the odd number of feet beyond that station is called 'plus'— plus 50, like 1079 plus 50."

After the votes had been tabulated, the regularity of which was admitted by plaintiffs, the council on November 5, 1951, passed Ordinance No. 47–B, announcing the

results of the election. In this ordinance a directional call, which properly was given as "east" in Ordinance 45–B and in the published notice, was shown as "west", which would leave a space a quarter of a mile that was not covered in that description.

The territory within the extension in general consisted of areas situated on the northwest and northeast portions of the former city limits.

The petition filed on December 31, 1951, alleged in substance, that plaintiffs were property owners in the territory sought to be annexed; that the lands sought to be taken into the City were used primarily for farming and agricultural purposes; that there has been no increase in the population of the City to necessitate such an extension for any proper municipal purpose; that there is now a large amount of unused lands in the City available for municipal purposes and residences and no buyers therefor; that the City is now unable to properly service the lands in said City with light, water and sewers and many of the residents of said City are without sewer service, and that the residents of the annexed area will never be able to get sewers to connect with their homes; that none of the ground has been platted or held for sale as town lots; that none of said real estate is needed for extension of streets or sewers, gas or water system or to supply service for abodes or businesses of its residents, or for extension of needed police regulation; that the sole purpose of the extension was to subject the real estate therein and the owners thereof to city taxation, with no possible benefit to plaintiffs.

On July 14, 1952, leave was granted plaintiffs to amend their petition by alleging that: "The description in the Mayor's Proclamation and Notice of Election was indefinite, misleading and uncertain, and the voters were unable to determine the area of the proposed annexation. The notice among other things in describing the proposed annexation said: '* * *

thence Southwesterly along the new South right-of-way of United States Highway No. 36 to a point on the South right-of-way line of Station 1079–50.' " The amendment then alleged: "There is no Station 1079–50 on the Missouri State Highway Survey Map".

Before discussing the main feature of the case we should first pass upon the question of whether the description of the property sought to be annexed was sufficient.

The trial court in its oral opinion and findings stated that the question as to designating the point 1079 was not regarded as "too vital to the matter," and that concerning "the matter of descriptions that we dealt with at considerable length in the trial, * * * my ruling on that would be that while the descriptions are not in the most satisfactory form, yet I think that they should be held to be sufficient to describe the boundary and to describe the intention so that we could say that they fix a boundary that is not wholly lacking in certainty, but is sufficiently certain that the proceedings will not be bad for the defects that appear in the description."

Mr. Edgar C. M. Burkhart testified that he was born and reared in Macon, graduated from its public schools, and by profession was a civil engineer. He received his degree in civil engineering at the Missouri School of Mines at Rolla in 1918. Since that time he has practised his profession extensively, particularly "all over the northern part of Missouri." He prepared the maps of the City of Macon which were introduced in evidence. At the request of the city council he prepared the description of the property sought to be annexed and which appears in Ordinance No. 45–B. While on the stand he was asked: "Will you state whether you can take that description and definitely determine the boundaries expressed in the description? A. Yes, sir." Then with the map (plaintiffs' exhibit 2) before him he took the description contained in the ordinance and, step by step, pointed out on

the map the exact boundaries of the annexed territory.

What a different situation than that appearing in the two cases relied upon by plaintiffs: Sassman v. State Highway Commission, Mo.App., 45 S.W.2d 1093, and State ex rel. Arthur v. Hammett, J., 235 Mo.App. 927, 151 S.W.2d 695. In the first case [45 S.W.2d 1094] it was disclosed that "the description does not embrace any portion of the land actually taken." In the second it was admitted by all the witnesses [235 Mo.App. 927, 151 S.W.2d 698] "that the descriptions in the original petition were so erroneous that a skilled engineer and surveyor could not, without field work, such as examining the fences and other marks of occupancy and by arbitrarily changing the descriptions contained in the original petition to conform to the descriptions obtained by such field work, locate the district boundaries and plat a contiguous tract of land."

■ Our Supreme Court in State ex rel. Musser v. Birch, 186 Mo. 205, 85 S.W. 361, 364, in considering questions of erroneous descriptions in annexation ordinances, said that "the root of the matter to be got at" is one of notice. In the instant case, the plaintiffs' petition contained a proper description of the land sought to be annexed. Plaintiffs appeared before the council and discussed and protested the proposed annexation. They prepared maps which were introduced in evidence and upon which the exact boundaries of the tracts annexed were outlined. It was not until July 14, 1952, over six months after their petition was filed, that plaintiffs made the claim that the description in the Notice of Election was indefinite "and the voters were unable to determine the area of the proposed annexation." There is not a word of testimony that a single voter was misled. A study of the transcript has convinced us that plaintiffs had notice and were fully aware of the exact area being annexed.

■ The error contained in the second ordinance (47–B), where the word "west" was used instead of the correct word "east", is of no consequence. In the case of Central Missouri Oil Co. v. City of St. James, 232 Mo.App. 142, 111 S.W.2d 215, 222, the second ordinance contained an error in the description. That error was the complete omission of one of the sides of a ball park which was being annexed to the city. In ruling that the second ordinance was unnecessary and therefore any error contained therein was harmless, the court said: "After an extension ordinance has been regularly passed, all that is necessary is for the council to count the votes and declare the result by appropriate minutes and records. This was done, and the record introduced in evidence. In the case of State ex rel. Brown v. Town of Westport, supra [116 Mo. 582, 22 S.W. 888], it was held that but one ordinance was necessary, and we will so hold in this case."

In our opinion the trial court correctly held that "the proceedings will not be bad for the defects that appear in the description."

Defendant City contends that the court erred in holding the extension of its limits void because: "The overwhelming weight of the evidence was that the annexation was not only reasonable, but that it was wise." On the other hand plaintiffs say the proposed annexation * * * "was void because it was unreasonable, arbitrary, and a fraud on the residents of said proposed territory * * *."

■ Thus it becomes necessary to summarize the evidence, but before doing so, attention should be directed to the governing statute, Section 77.020 RSMo 1949, V. A.M.S. It reads as follows: "City limits may be altered, how— The mayor and council of such city, with the consent of a majority of the legal voters of such city voting at an election thereof, shall have power to extend the limits of the city over territory adjacent thereto, and to diminish the limits of the city by excluding territory therefrom, and shall, in every case, have power, with the consent of the legal voters as aforesaid, to extend or diminish the city

limits in such manner *as in their judgment and discretion may redound to the benefit of the city.*" (Italics ours.) This as said in one of the cases, *"is a broad grant of discretionary power."*

Recently the St. Louis Court of Appeals had occasion to consider an identical statute in the case of Dressel v. City of Crestwood, 257 S.W.2d 236. This language appears in that carefully considered opinion: 257 S.W.2d loc. cit. 247, 248.

"Since the General Assembly has by the terms of the above mentioned statute given the Mayor and Board of Aldermen a discretion in the determination of the necessity and reasonableness of an annexation, the courts will interfere only to correct an abuse of that discretion. The rules which must govern this court in the determination of the questions presented on this appeal are stated by our Supreme Court in State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, 398, as follows:

" 'It was not for the trial court to decide whether, upon the facts shown to exist, the extension of the boundaries was necessary, but to determine whether or not, upon the facts shown to exist, reasonable men would differ as to the necessity of the extension. If the question of whether or not the territory involved should be included within the city limits was fairly debatable, that is, if there was substantial evidence each way so that reasonable men would differ about its necessity, then the decision of that question was for the city council and the city electorate and not for the court. When the evidence shows a fairly debatable question about the matter, then neither way the question might be decided would be unreasonable.' See also, City of St. Louis v. Weber, 44 Mo. 547; Copeland v. City of St. Joseph, 126 Mo. 417, 29 S.W. 281.

"This being an equity case, we are not bound by the trial court's finding, but must try the case de novo and render such judgment as in our opinion is just and proper upon the whole record. However, in passing upon the case, we are bound by the same rules as the trial court. We cannot substitute our judgment for that of the city officials, but must confine our inquiry to the question whether, upon the facts disclosed, said officials could reasonably have found that the annexation was necessary, proper and reasonable; and, since it was within the statutory power of the Board of Aldermen to provide by ordinance for the extension of the city limits, the ordinance in question is presumed to be reasonable and valid until that presumption is overthrown by evidence which clearly shows the contrary. Hislop v. City of Joplin, 250 Mo. 588, 157 S.W. 625; State ex rel. Hart v. Whitaker, Mo.App., 218 S.W.2d 121; State ex inf. Taylor ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 228 S.W.2d 762. Where the reasonableness of an ordinance is doubtful, the doubt must be resolved in favor of the ordinance. State ex rel. Musser v. Birch, 186 Mo. 205, 85 S.W. 361; Algonquin Golf Club v. City of Glendale, 230 Mo.App. 951, 81 S.W.2d 354; Seifert v. City of Poplar Bluff, Mo.App., 112 S.W.2d 93.

"And the burden of proof is upon the plaintiff to show lack of lawful reason to support the action of the Board of Aldermen." (Citing many cases.)

See also the more recent opinion by the same court in the case of Mauzy v. City of Pagedale, Mo.App., 260 S.W.2d 860.

That the Mayor and members of the city council gave careful consideration to the annexation question before submitting it to the voters is conceded. Mr. Thomas W. Martin who had just completed his tenure, after seven years as Mayor, testified in detail about the factors that were taken into account in the passage of the ordinance. He was followed on the stand by Mr. Fred Llewellyn, Mr. Harold Hockman and Mr. W. M. Dodson, councilmen, who testified to the same effect. When defendant offered two more councilmen its counsel stated: "We will refrain from putting them on, with the understanding that their testimony will be the same as the other councilmen that have testified—that they took

into consideration and carefully considered this action and considered as factors the apparent trend of growth, the police protection, fire protection, the water development, and the fact that such annexation in their opinion was necessary and of benefit to the prosperity of the City." To which plaintiffs' counsel replied: "Yes, we admit that they would testify to that."

Plaintiffs Waller and Chambers testified that Macon has lost a shear factory, a button factory, a garment factory, a shoe factory, a wholesale grocery house which had burned, and a Negro college, and that the mining industry is decreasing, although one mine in Macon County has a state record for daily coal production. The Missouri Blue Book shows Macon's population to have been 4206 in 1940 and 4152 in 1950.

Defendant's evidence showed that during the past 10 years the bank assets of the bank in Macon had increased from $2,-212,000 to $6,246,000; that the number of telephones served by the telephone company in Macon had increased in the last 10 years from 846 to 1945 telephones; that in the last 8 years the number of people served by the gas company had increased over 100 per cent; that in the last 20 years the postal receipts had increased from $20,568.36 to $51,531.40; that in the last 10 years the public school receipts had increased from $82,000 to $205,000 and its expenditures had increased from $74,000 to $177,000 and that it had added several small districts; that the Macon Building & Loan Association assets had increased in the last 10 years from $500,000 to $1,500,000, and in the last 22 years had grown nearly 400 per cent; that in the last 20 years the demand for city electricity had increased 10 per cent each year, and doubles every 10 years; that numerous new businesses had moved into town; and that there were then 26 new houses being built in Macon.

Plaintiffs' witnesses stated that, in about an hour's period one evening during the trial they had counted and made a list of vacant spaces, which they termed vacant lots, varying in size from 25 to 50 feet, which in their opinion would total 230 vacant lots and 22 acres within the former city limits. They did not measure any of these vacant spaces and could not tell or show on any map where these spaces were located. They further stated that they did not know whether these spaces were platted as lots, and had no information with reference to their ownership, reasonable market values, or availability for sale.

Defendant's evidence shows that suitable building lots in Macon are very few and very scarce, there being possibly between 40 and 50 lots that are suitable without considering whether they are also available; that most of the vacant spaces discussed by plaintiffs were in areas of Negro population on the south side, next to the railroad, business district, or cemetery, or along Highway 63 close to the city sewage disposal plant and sale barn and were not desirable for residential property.

With reference to the northwest annexed area situated west of the junction of the two U. S. Highways, it was shown that plaintiff Waller's land is located south of the Highway No. 36 Spur; that his improvements are a house and feed shed; that the extension of the city limits included 10 of his 60 acres, which he used for pasture for his 18 cattle; that the money earned from his cattle and 20 some-odd chickens supplements his income derived from surveying for the State Highway Department; that none of the other property in that area is farmed, and that plaintiff Waller filed a farmer's income tax return for the year preceding the lawsuit but had not filed such a return for any prior years.

Defendant's evidence concerning this northwest area showed that numerous lots had been leveled and platted and advertised for sale for residential building purposes and that new houses were being built in this area; that the value of the land in this area is 4 or 5 times as great for city property as it is for agricultural purposes; that several new houses have been constructed recently in that area by persons who operate businesses in Macon. Defendant also pre-

sented the testimony of experienced real estate men indicating that all this northwest area has been developed primarily for residential property and is adaptable as city property and that its per front foot value would be worth between $10 and $15 which is a comparable value to similar land within the former city limits.

With reference to the Northeast annexed area east of the junction plaintiffs' evidence was that the Careys, Hartungs, and Chambers live on their lands and use them for farming purposes; that Sanfords and Yeast do not use their land for any farming purposes but only for their homes; that Spicer, Ilgenfritz and Gaunt use their land for farms, and that Andrews uses his property to store farm machinery. Plaintiffs' evidence also showed that the Spicer 10 acres in the annexed area is pasture land; that of the Chambers 20 acres on the north side of Highway 36 less than 10 acres was annexed which was leased in exchange for services for its clover and lespedeza crops, and that the annexed 500 foot strip of the leased Carey property includes part of a bean field and pasture.

Plaintiff Hartung formerly lived in the city and now lives in this vicinity and owns 20 acres of which less than 10 acres was annexed. He has recently used his land for milk cows, garden, hogs and chickens and receives government benefits but did not file a farmer's income tax return. He believed that the land in this area is agricultural land. Plaintiff Ilgenfritz testified that he owns 107 acres in this vicinity on both sides of Highway 36 with several improvements of which about 21 acres were included in the extension; that he uses his land for raising hogs and cattle; that all of this area has been used for general farming; that he secures between 60 to 70 cattle and 75 to 100 hogs in the spring and fattens them for market; that the Mott, Butler and Gaunt land in this area is agricultural land; that his house is 700 feet east of the east boundary of the extended city limits and is not within the area annexed; and that he does not want to live in the city.

Defendant's evidence concerning this northeast area showed that Bowers Service Station and a drive-in restaurant were on the south side of Highway 36; that a Shell Service Station and used car parking lot and the Andrews farm machinery lot were on the north side; on the latter of which had been a lots-for-sale sign before this suit was filed; that the Carey property at the northeast corner of the junction has had a filling station on it for many years; that the Travelier Restaurant recently sold for $40,000; and that a new motel worth between $75,000 and $125,000 was recently constructed in the northwest corner of the junction. There is also a filling station and cafe on the southwest corner and a filling station and garage on the southeast corner of the junction. It was also shown that in 1948 plaintiff Ilgenfritz sold to plaintiff Johnson a tract for a drive-in restaurant 350 feet square from the center of the highway for $2300; that plaintiff Hartung had been a mechanic for 28 years and formerly operated a garage and filling station, also an open air dance floor on his property; that plaintiff Chambers had long been a resident of Macon and bought her large house in this area in 1942, having previously operated a wholesale grocery business in Macon and was not dependent on any farm income; that her house cost $10,000 plus $8,000 spent in addition; that it could not be replaced for $30,000.

Defendant's evidence also showed that practically all these properties were used primarily for residential purposes and that this land both north and south of the highway is adaptable for city purposes; that neither the Chambers, Hartung, Carey, Spicer, Gaunt nor the Ilgenfritz places are farm properties. It was also stated that this northeast area is the only area from which children could go to the new grade or high schools without crossing either a highway or railroad track; that the lots for sale in the south side of town, as in Long's tract, have sold for $25 and will sell for $300 to $400 whereas the same size lot in the annexed areas will sell for $700 to

$1,200 each. Postmaster Butler testified that in 1951 he paid Gaunt $150 an acre for a 20 acre tract in Block 36 within the annexed area bordering the Ilgenfritz property on its north and east sides, and that he plans to open streets and sell residential lots there. Defendant's witness Wright testified that he had requested to be annexed and has new $15,000 to $20,000 houses in his new, restricted subdivision which touches the southern boundary of the annexed area and the eastern boundary of the city limits, with lots for sale at $12 per front foot; that other lots have been platted and new houses built in this vicinity which is close to the new grade school.

With reference to factors pertaining to both annexed areas, plaintiffs' testimony was that the Macon sewer system was inadequate and served about half of the homes in the city; that where the disposal plant along Highway 63 empties sewage matter into the creek there are odors; that certain of the people in the area along the Spur use septic tanks; that there is no sewer system along Sunset Drive in the old city limits; that the system empties into a ditch, although it is permissible that the sewage, if properly treated, be discharged through an open ditch.

Earl V. Porter, district engineer with the Missouri Division of Health, testified that he had met with the city council during the last few years and that the city had been making minor improvements in its sewage system and plant; that the city had recently received the Feasibility Report prepared in connection with a city program for improving the sewer facilities adequate for Macon with its limits extended; that for health purposes it would be better for the people in the annexed territory to secure water from the city; that Macon recently adopted a milk ordinance; that it would be best for the health of all concerned throughout the community to have a uniform supervision of the health regulations within both the annexed areas and the former city limits. Defendant city also showed the operating procedure of its sewage disposal plant; that it has made improvements in the chemical treatment of the sewage and followed the advice of the Missouri Board of Health; that the Travelier Restaurant in the annexed area is presently connected with the city sewer system; that the city had trouble only during flash floods due to the absence of storm sewers and has received only two complaints about odors during the last few years.

The testimony further established that no streets, alleys, sidewalks, or sewers have been constructed in the annexed areas; that those residing in the northwest annexed area have been receiving their water and electricity from the City of Macon for many years; that those residing in the northeast annexed area formed a corporation by which for many years they secured both water and electricity from the city at volume rates although this group recently chose to secure their electricity from the REA. It was admitted in open court by plaintiffs' counsel that all the plaintiffs use the City of Macon for all shopping, picture shows, churches, lodges and theaters; that all plaintiffs' children attend the High School in Macon, and that all persons in the annexed area get their water from the city.

Defendant's evidence also established that during recent years there had been numerous demands for city services within and beyond the annexed area, including several requests for police and fire protection; that without such extension difficulties of enforcement of various ordinances existed south of Highway 36 as to the cigarette and milk sanitation laws, merchant's license and other matters; that the city had been furnishing water and electricity even to persons beyond the annexed areas and can promptly serve all new developments within the annexed areas; that the traffic flow map showed that between 4,000 and 6,000 vehicles used the Spur in the northwest annexed area during a 24 hour period, and that it had been necessary to have a speed trap by the Wardell District school house at the request of the residents in that vicinity.

Defendant's evidence also showed that in determining the east boundary line of the extension it was desired to make the city limits regular; to extend the area north of the Highway, east of the junction, and south of the Spur the width of a city block to allow room for alleys and to avoid taking in agricultural land. It was shown that such extension to the northeast was necessary for the enforcement of police ordinances and for fire protection; that more than 6,000 vehicles operated over Highway 36 in the annexed area every 24 hours; that this northeast area included the new $300,000 grade school around which were several new houses and which would continue to build up and require police and fire protection. It was further shown that the area northeast of the junction was being served by the city and had all the advantages of the city and that the residents there enjoyed such privileges cheaper; that the streets and sewers could be built and extended into this area northeast of the junction; that the annexation of the property in the annexed areas was necessary to foster the growth and possibilities of the city; that none of the property annexed was taken in for purely revenue purposes; that one of the main reasons for the annexation was that tracts and lots in the area already had been offered for sale, sold and adapted for residential and commercial purposes; that there was no favoritism or discrimination in selecting the area to be annexed; that the areas selected were the most thickly populated and represent the actual growth of the city and are the places of abode of persons working in Macon; that there was no farm land other than pasture within 500 feet of the highway right of way line.

Numerous expert and lay witnesses for defendant testified further that the recent and future tendency of Macon has been and is to develop along the Spur and both east and west of the junction; that the greatest residential developments in recent years have been in the annexed areas both northwest and northeast of Macon; that all of this land is subject to being marketed and sold as town property; that this annexed land had been and was being sold for a value corresponding with or higher than land in the city because of its closeness to the city and because of its adaptability for town uses both residential and commercial; that if there were streets in the northeast annexed area the land would be worth $9 or $10 per front foot; that the land both north and south of Highway 36 in this area has much greater value for prospective town use and as urban property than as agricultural property; that the land east of the junction and south of Highway 36, from a productivity point of view, would not exceed $65 or $70 in value per acre for agricultural purposes, whereas that same land for residential purposes would be worth $750 per half-acre lots; that the new houses being built in Macon along the Spur, in the new subdivisions, and in the northwest and northeast annexed areas have varied in cost from $10,000 to $28,000; and that insurance rates would be decreased on the property in the annexed areas on a frame approved roof type house at the rate of $1.40 per thousand dollars per year.

■ Under the above facts how can it be said that reasonable men would not differ as to the necessity of the annexation? And, say the cases, if there be substantial evidence each way so that reasonable men would differ about its necessity, then the decision of that question was for the city council and the voters and *not for the courts.*

■ The facts bring the instant case within the rule announced in the Dressel case, supra [257 S.W.2d 249], that "a case of reasonableness is made where it appears that the land annexed is so situated as to be adaptable to urban purposes, and necessary or convenient to a reasonable exercise of the city government."

It would serve no useful purpose to review all of the cases cited by plaintiffs. They involved different facts from those present in the instant case. For instance, in the case of Jones v. City of Ferguson, Mo.App., 164 S.W.2d 112, 118, it was shown

"that defendant has a large area within its original limits which is undeveloped; that there are hundreds of lots of normal size platted and held for sale to house any growth of the city's population". And in the case of Ozier v. City of Sheldon, Mo. App., 218 S.W.2d 133, only 55% of the residential area was built up and "45 percent vacant." And in the case of Nolting v. City of Overland, 354 Mo. 960, 192 S.W. 2d 863, "a city of only 474 acres and 3,000 inhabitants proposed to annex 5591 acres and 30,000 inhabitants." See discussion of Nolting case in the more recent case of State ex inf. Taylor ex rel. Kansas City v. North Kansas City, 360 Mo. 374, 228 S.W.2d 762, 774.

■ In our opinion, the evidence shows that there was before the council and voters a question concerning the necessity of the annexation which, to say the least, was fairly debatable and about which reasonable men would differ, and that there was no substantial evidence showing that the action of the city in including the area was so arbitrary, unjust, and unreasonable as to amount to an abuse of the discretion which the statute delegated to it.

As we have stated, the Wardell School District was permitted to intervene, over defendant's objection, as a party plaintiff. This school's only building and equipment, one-eighth of the area of its district, and 14 of its 24 pupils were within the extended city limits. The trial court in its findings indicated that it considered that "the school district is properly a party to the action, although I think that they are limited to a consideration of the reasonableness of the extension, the same as any other resident or property owner would be, and I have so considered their rights from that standpoint."

Section 165.263 RSMo 1949, V.A.M.S., provides *without qualification* that: "every extension * * * of the limits of any city * * *, shall have the effect to extend the limits of such town or city school district to the same extent * * *." At no place in this statute, nor any of the other statutes in Chapter 165, is it expressly stated that the extension of the city limits or the extension of the limits of the city school district is subject to the approval of anyone other than the city council and the voters of the city. We fail to find any language in this statute, or any other statute, which even implies that a city must obtain the permission of anyone other than the voters before extending its limits.

■ Assuming that the school district did have a right to intervene, in any event, it was required to carry the same burden of proof that was imposed upon the other plaintiffs. Having held that that burden was not met, the judgment is reversed.

All concur.