**CITY OF CAPE GIRARDEAU, Missouri, a Municipal Corporation, Plaintiff, Respondent,**

v.

**F. J. ARMSTRONG, Albert O. Spalding, August H. Sanders, Seth S. Barnes, Glenn S. Johnson, Don Ikerman, David Hale, Robert Wilkenson and James Ainsworth, as Representatives of a Class, Defendants,**

and

**Homer A. George, Perry L. Krekel, Leonard M. Edmiston, Russell Armstrong, Lane Austin and A. L. Wessel, Intervenors, Appellants.**

**No. 32610.**

St. Louis Court· of Appeals.

Missouri.

July 18, 1967.

R. P. Smith, Cape Girardeau, for defendants-intervenors-appellants.

Limbaugh, Limbaugh & Russell, Stephen N. Limbaugh, Cape Girardeau, for plaintiff-respondent.

RUDDY, Judge.

The City of Cape Girardeau (hereinafter referred to as City) brought this action, pursuant to the provisions of Section 71.015 RSMo 1959, V.A.M.S., (referred to as the Sawyer Act) seeking a declaratory judgment authorizing it to proceed as otherwise authorized by law in the annexation of approximately six to eight square miles of unincorporated land adjoining its present municipal borders. The defendants, inhabitants and owners of land in the area to be annexed, were sued as members of a class. Other persons living in the area proposed for annexation were permitted to intervene as defendants. All will be referred to as

defendants. A non-jury trial resulted in an order and declaratory judgment that the proposed annexation was reasonable and necessary and authorized the City of Cape Girardeau to proceed under the appropriate statutes providing for an election to determine whether or not a majority of the qualified legal voters of the City favored the extension of the City over the territory described in plaintiff's petition and sought to be annexed. Some of the original defendants and intervenors appealed to the Supreme Court of this state. A motion to transfer the cause to this court was filed by the City and said motion was sustained by the Supreme Court.

The petition pleaded an abundance of facts, (which we need not detail because they will be summarized in our statement of the ultimate facts shown in evidence) showing, as required by Section 71.015, supra, (1) the area to be annexed; (2) that such annexation is reasonable and necessary to the proper development of said City; and (3) the ability of said City to furnish normal municipal services of said City to said unincorporated area within a reasonable time after said annexation is to become effective. Such action shall be a class action against the inhabitants of such unincorporated area under the provisions of Section 507.070, RSMo, V.A.M.S., Laws, 1953, p. 309 § 1.

Defendants in their answer, inter alia, admit paragraph 4 of plaintiff's petition, wherein it is alleged that the defendants were joined as representatives of a class of all the inhabitants of said unincorporated area under the provisions of Section 507.-070, supra, and that the defendants named have been fairly chosen and adequately and fairly represent the whole class, in that said defendants are all owners of real estate within the area proposed to be annexed. It was further alleged in said answer that the properties owned by them within the area to be annexed were purchased and developed by them as and for rural and agricultural lands and that the annexation would destroy such character of their prop-

erties and would burden them with additional heavy taxes and would confiscate their properties without compensation by destroying the present and contemplated use of said properties. Said defendants further alleged that they now enjoy many of the services which the City proposes to give to said lands and the owners thereof if annexation be decreed and completed.

The transcript of the evidence and the exhibits form a voluminous record which we have read and studied carefully. The evidence took a wide range and it would serve no useful purpose to detail all of it. To do so would only extend the length of this opinion beyond reasonable limits. There is little conflict in the testimony and the general information, facts and statistical data about the schools and school system, police department, fire department, library, parks and recreational areas, streets and sewers, water and utilities, and other municipal services rendered by the City, concerning their services, personnel, wages and equipment are not materially controverted.

The City (respondent) dissatisfied with the statement of facts set out in defendants' (appellants') brief has ably and fairly set out in its brief a comprehensive statement of facts. In presenting our summary of the facts we can do no better than adopt the format followed by the City in its statement of facts. In addition, we adopt such of the statistical data we feel pertinent to the issues. We proceed to summarize the facts drawn from the record and in some areas detail the evidence.

The City of Cape Girardeau, famous for its roses, was founded as a town in 1806 and was incorporated as a city in 1843 and elected to become a city of the third class, alternative form of government, in 1918. This government was continued until September 20, 1965 when the city was organized under the City Manager form of government.

The boundaries of the City were established on March 29, 1872 and were extended

on three occasions since that date; on January 15, 1925, April 25, 1947, and June 8, 1958. The last extension of 1958 added about 1800 acres of land and the City now contains approximately 10 square miles of land or 6400 acres. At the time of trial in December 1965 its population was approximately 30,000 persons, which included the student enrollment at Southeast Missouri State College located in the City. The census report since 1910 shows a steady increase in the population. In 1910 the population was 8475 and has grown to approximately 25,000 persons, plus 5,300 graduate students attending the aforesaid college. The City is located on the west bank of the Mississippi River and for that reason can expand only in three directions. It is bounded on the south, west and north by an irregular pattern and border that does not follow any natural or artificial landmarks. Several major highways traverse the City and are located nearby. Interstate 55 connecting St. Louis and Memphis, Tennessee, passes west of the City and as we shall point out later forms the western boundary of the area to be annexed. Interstate 55 is a limited access highway and three outlets flow from this highway into Cape Girardeau: U.S. Highway 61 connects with I-55 and by an interchange approximately one and one-half miles northwest of the northwest corner of the City provides access to the City from I-55. From this interchange U.S. 61 continues southeast into the City and then turns southwest to a point where it again connects with I-55 at an interchange and merges into that highway going south. About one-half the distance between the north and south intersections of U.S. 61 and I-55, Missouri Route K also known as the Gordonville Road, comes out of Cape Girardeau and passes over I-55 and connects with I-55 by an interchange immediately west of the City. Traffic may proceed eastwardly out of the City by means of a toll free bridge across the Mississippi River connecting with Illinois State Highways 146 and 3. There are a number of other state roads that traverse the City and

pass westwardly, either over or under I-55, but at which points no interchange with I-55 is provided. All of these highways and roads referred to, with the exception of I-55, extend or pass through the area proposed to be annexed. One of these roads namely, Route K or Gordonville Road, is to be constructed as a limited access highway from U.S. 61 in the City west to I-55 interchange. The evidence indicates that the right-of-way is presently being acquired for this project, the purpose of which is to connect the Illinois traffic that comes over the Mississippi River bridge referred to with I-55. This project was the result of a survey of traffic needs by the Highway Department of the State of Missouri. This survey also illustrated the projected future street and highway needs.

The City has 83 miles of improved streets, three hospitals having a total bed capacity of 275, staffed by a large number of doctors. It has a daily newspaper having a large circulation and a weekly newspaper. There are two radio stations, eight motels and three hotels that provide 653 rooms in the City and within the city limits there are approximately 40 churches representing all faiths. There are 20 housing developments planned or under construction and the percentage of home ownership is 82%. Its population and industry is serviced by the St. Louis—San Francisco Railroad and the Missouri Pacific Railroad, eight motor freight carriers, and dry dock facilities available for river transportation. It has an airport that is supervised by an airport board appointed by the city fathers; however, the airport is not in the present city limits nor in the proposed annexed area but is in an adjoining county. At this airport the Ozark Airlines provides commercial air service and the Cape Central Airways provides a charter service. There is a new terminal building and four hangars. A Federal Aviation Communication station is located at the airport. A bond issue was voted for a new East-West runway, which bonds were matched by funds obtained from the Federal Government. The East-West

runway will have taxi strips and will be 6,500 feet in length so as to accommodate jet service. This project is now underway. The testimony indicated that the airport was the third most active one in the State of Missouri, measured by take offs and landings. The City has three banks with total assets of over $46,000,000 and three savings and loan associations with total assets of over $70,000,000. The assessed valuation (1964–1965) of the City is $40,000,000 of which $30,500,000 is a real estate assessment. The City follows a general State practice of a 30% ratio of assessed valuation to true valuation. There are 335 retail establishments, 70 wholesale establishments, and 120 industrial firms. The number of employed persons in the City appears to be above the general average, the evidence showing unemployment to be 3½% as compared to 5.3% in the surrounding counties.

SCHOOLS. The City is well provided with schools, having 7 elementary, 2 junior high, and 2 senior high schools in the public school system. In addition there are five private schools, St. Vincent's College, a Catholic Preparatory School for the priesthood, an Office Training School, a privately owned secretarial school, and, as heretofore noted, The Southeast Missouri State College. The public school system has a bonded indebtedness of $3,303,000 and a tax levy of $3.40 per $100 of assessed valuation. This tax levy seems to compare favorably with other similar districts in the State of Missouri according to the Missouri Tax Rates published by the Missouri Public Expenditure Survey in December of 1965. The difficulty with making accurate comparisons is that the compilations do not show which school districts maintain high schools. As will be pointed out later none of the school districts bordering the present city limits of the City of Cape Girardeau have high schools. The school districts that adjoin some part of the present city limits of the City are Kage, Marquette, Nell Holcomb and Campster. A part of each of these districts is in the

area of the proposed annexation and the evidence shows that enough acreage is taken in the Kage, Marquette, and Campster districts that may not leave enough assessed valuation on which to operate such districts. The evidence shows that the school buildings of the Marquette and Kage districts and much of the land of the Campster district are within the annexed area and it was anticipated that those districts would elect to become a part of the Cape Girardeau School District. Children from the school districts named outside of the City have available schools with only grades one through eight in their districts. Many of the children in the named school districts attend the elementary schools in the City and pay a tuition fee. These areas named do not have high schools and the children in the areas must attend high schools provided in the City or the Southeast Missouri State College campus high school. The evidence shows that most of the students in these districts attend the campus high school. The normal growth of the entire community has caused an increase in public school enrollment of from 3% to 5% each year. The Board of the City Public School System has made plans for the expected annexation and according to the Superintendent of Schools of the City if the entire districts of Kage, Campster and Marquette and a part of the Nell Holcomb district were absorbed it would increase the school population about 1½%. The Board and the Superintendent felt that the absorption of these children into the City schools would create no problem. The Superintendent testified that the school system was now in a better position to absorb these students than it has been since the nineteen thirties. There is under construction at the present time in the northwest portion of the City a new grade school, which is located about 1200 feet from the existing city limits. The school system has plans for building new schools if needed and presently owns another site near the north part of the present city limits, held for future growth. The Board provides its students with transporta-

tion for those who live more than one mile from school. The Superintendent testified that this transportation can be extended to cover the children living in the school districts in the area which is to be annexed. Two persons from the Campster school district and three from the Kage school district testified that they desire the annexation because they wanted their children to attend the city public schools. One of the witnesses from the Kage school district complained about the physical facilities of the school in that district. One of defendants' witnesses testified that it was doubtful that the Campster school district would be able to continue to operate if the annexation is approved and opposed the annexation because he did not want Campster school district included in the Cape Girardeau school district.

POLICE DEPARTMENT. This department consists of a Chief who is a retired Missouri Highway Patrol Officer, two Captains, two Lieutenants, a number of Sergeants and Patrolmen—a total of 32 officers who operate on a 24 hour basis in three shifts of eight hours each. In addition it has three civilian employees. The pay scale seems adequate and includes increases based on length of service together with sick leave and Workmen's Compensation benefits. The equipment consists of five fully equipped patrol cars, in addition to other vehicular equipment and other miscellaneous equipment appropriate to the operation of a Police Department. The department has a polygraph or lie detector unit operated by one member of the department trained in the operation of this unit. The department has a canine corps of eight dogs, one dog is attached to the mobile unit and the others are used for walking patrols. The business district of the City is patroled by walking units and the canine corps. The Chief of Police testified to the existence of good cooperation and communication with law enforcement officers in Southeast Missouri and Southern Illinois stating that emergency calls can usually be answered anywhere in the present city limits within three minutes. There is legal authority for a 75 man auxiliary police unit and the Mayor of the City testified that at the present time there were about 65 active members in this unit. This unit helps in directing traffic and is available in case of a national disaster or local catastrophe. The Civil Defense Program is under the leadership of the auxiliary police and the Mayor testified that the auxiliary police were able to function not only within the present city limits but within the anticipated expanded city limits as well. The Chief testified that it is an accepted practice to have at least one policeman for each one thousand population and he said the City maintains this practice and can for the area to be annexed. It was thought that one more vehicle and three extra policemen would be needed to service the proposed annexed area adequately and plans and surveys have been made to provide this service to the annexed area. If the annexation is consummated a sub-station is planned for location in the City Arena building in the western area of the present City.

One of the witnesses living in the area proposed to be annexed says she wants to come into the City because her home was burglarized the week before the trial and she did not have any police protection or fire protection.

FIRE DEPARTMENT. The City has three fire stations, one in the downtown business district, one in the west end of the City, and one in the north end of the City. The downtown station is equipped with a Segraves 750 gallon per minute pumper and will pump from 800 to 850 gallons per minute from a fire hydrant. It is also equipped with an 85 foot aerial truck used primarily for rescue work and industrial fires. It will service all the buildings in the City except the College High-Rise Dormatories. The downtown station also has a 750 gallon rescue and disaster truck and a 750 gallon per minute pumper used for stand-by needs. This station also has resuscitation equipment. The west end station has two pumpers; a 750 gallon and a

500 gallon per minute pumper. The north end station has a 750 gallon per minute pumper and a 500 gallon water tender. The total manpower of the department is 35. In this department also the pay scale seems adequate and includes increases based on length of service together with sick leave and Workmen's Compensation benefits. The men are on duty for twenty-four (24) hours and have the next twenty-four (24) hours off. There is a training program in effect at all times for the men. 95% of all City fires are extinguished with the water on the trucks and without the necessity of attaching hose to a hydrant. Within certain fire limit districts of the City erection of buildings must follow certain restrictions which make the buildings less of a fire hazard than the ordinary structure. A substantial portion of the business, commercial and industrial districts of the City and along the main traffic arteries of the City is within the fire limit districts. The City has entered into contractual arrangements with other nearby communities for reciprocal fire equipment use. If the City has a severe fire, either or all of these other cities, three in number, will send their men and equipment to help fight the fire and in turn the City reciprocates for these towns. Otherwise, the City fire department has been instructed not to go outside the city limits to answer a fire alarm. Thus it offers no fire protection presently to the area proposed to be annexed.

Co-related to the operation and efficiency of the fire department are the insurance fire rates of the community. The Chief of the City's fire department testified that the Missouri Inspection Bureau sets the fire insurance rates for municipal areas on a one to ten rating, i. e., one is the best rating and ten is the lowest. The rating classification is based on the water distribution, the fire equipment and personnel, building code, electrical code, and the manner in which these codes are enforced. The better the facilities and the availability of water the lower the insurance rate. Much of the City is rated seven and the balance along the

outer limits is rated nine. All rural areas, which would include all of the area sought to be annexed, are rated ten. The testimony indicated that the area proposed to be annexed would automatically be reduced from ten to nine when the annexation becomes effective. It was also shown that the present seven and nine classifications in the City will remain constant notwithstanding the annexation, provided all of the factors that produced these classifications remain. In order for the annexed area to be given a rating of seven, fire hydrants will have to be placed in the area, two additional stations must be provided, each equipped with at least one 750 gallon per minute pumper, and a regular crew of three. The cost of the pumpers is about $20,000 to $25,000 each and the fire stations would cost $30,000 each. The Fire Chief in his testimony said that if the annexation is consummated the department will be in a position to answer calls in the area proposed to be annexed.

LIBRARY SERVICES. The Cape Girardeau Public Library is supervised by a nine member board, which board has employed Gene Martin as Head Librarian, who has twelve years of library experience and holds a graduate degree in Library Science from the University of Illinois. He testified that the library is housed in a building containing 8000 square feet and presently contains 56,000 volumes which is to be increased to 100,000 volumes in five years. In addition to the book service, the library furnishes the lending of magazines, microfilm, film strips and art prints and all of its services are extended as a research library for Cape Girardeau, Scott, Mississippi, and Perry Counties, by reason of which the persons living in the area to be annexed are permitted the use of the library. The City tax for library purposes is 14¢ but the library is also supported by State and Federal funds. The people in the area to be annexed apparently pay 10¢ for library services to the Riverside Regional Library which they will continue to pay in the event the annexation passes and will not be re-

quired to pay the 14¢ City Library Tax. Gene Martin, the librarian, testified that the circulation of the library has grown from 90,000 in 1961 to 150,000 in 1965, representing a substantial usage increase. He said an increase in the City Library's budget has been granted to accommodate this growth. He further said that there will be no problem to the library if the annexation is consummated because it has already absorbed users in outlying areas around Cape Girardeau.

PARK AND RECREATIONAL SERVICES. There are eight parks in the City which seem to be distributed conveniently throughout the various parts of the City. These parks variously include a lighted little league baseball diamond, softball diamonds, an ice skating rink, unlighted ball diamonds, shelters, picnic areas, lighted tennis courts, a lagoon for fishing, swimming pool, a lighted basketball court, swing sets and sliding boards, cooking areas and general playground equipment. The total area of the parks is approximately 200 acres with plans for additional acreage to be added to the various parks. The largest park is the Arena Park which is located in the west of the City and comprises 100 acres. An additional 25 acres is being developed to the south of it to add to this park. In addition to some of the facilities and equipment mentioned above, this park contains an Arena Building, a track for horse racing and a stock car race track. Immediately north of this park the United States Government plans to construct a Naval Armory ·for which the City and the Government entered into a long term lease. Plans are underway by the nine member park advisory board to establish four other parks in various parts of the City. The park crew is composed of five men and a superintendent who have charge of the maintenance of the City park areas. There are two parks in the area to be annexed, one in the northeastern part and one at the north intersection of I–55 and U.S. 61.

STREET DEPARTMENT. The equipment of this department consists of two road graders, a hi-lift, two yard hi-lifts, a back hoe, six two-ton dump trucks, two pickup and two panel trucks, a mud jacking machine, two street sweepers, a Moore tractor and miscellaneous other equipment and tools. The department is also equipped with a communications system. Its personnel consists of twenty-three men and similar to the other departments mentioned has sick leave and Workmen's Compensation benefits. Its service consists of the general maintenance of the City's streets, grading, graveling, opening ditches, and making street repairs and emergency maintenance and repairs. When streets and sidewalks and curbing are installed the property owner has to pay the costs thereof. The superintendent of streets, John Eldridge, testified that the department would be able to furnish services to the area to be annexed and would continue to cooperate and work with the Cape's Special Road District. He said additional equipment would not be needed to service the annexed area, but additional manpower would be needed to operate the present vehicles more frequently in the new area.

SEWERS. The Superintendent of Streets, John Eldridge, also has under his jurisdiction the maintenance of sewers. A fair appraisal of the superintendent's testimony would indicate that all of the City has sewers, with the exception of some areas bordering the present city limits. While some of these areas are on the northern and western limits of the City, the largest areas that seem to have no sewers are in the extreme northeast and southern portions of the City; however, the superintendent indicated that an area near the northeast portion had just been formed as a sewer district. It seems that the areas that do not have sewers are those that are lightly populated and where there is no demand for sewers. Other areas bordering the city limits that are well populated have sewers. In some of the areas that do not have lateral sewers there are trunk lines which extend into these areas. The City does not build sewers itself. On proper request it will es-

tablish a district, provide the engineering and supervising and let a contract and the costs will be that of the property owners. The Superintendent of Streets testified that the City on sufficient request is in a position to sewer any district.

Raw sewage from the City's sewers empty into a sewage disposal plant operated by the City. The Mayor of the City testified that this plant had been approved and accepted by the Federal Government and that it is designed to accommodate a population of over 50,000 people. The City has entered into a contract with City Sanitation Incorporated to service the City in the gathering of garbage. The Mayor testified that this service could be extended to the area to be annexed. The disposal plant has become inoperative several times because of flood waters from the Mississippi River. The plant capacity is 6,000 gallons a minute and it normally operates at about one-third its capacity and the largest use to the date of trial was 3,000 gallons per minute.

WATER, GAS AND ELECTRIC POWER. Provided by Missouri Utilities Company and the company is subject to the regulations and orders of the Missouri Public Service Commission. The company provides gas service to Columbia, Missouri, California, Missouri and a number of small towns in Southeast Missouri. Its main office is located in Cape Girardeau, Missouri. It supplies water, gas and electric power to the inhabitants of the City. The company is serving the entire City with gas and water except for two or three remote areas. In one of these remote areas in the north part of the City some of the inhabitants have requested water service but have not received it because the company has found it uneconomical to furnish this service. In another area, about 400 feet from the western edge of the city limits, gas is furnished but water is not. One of defendants' witnesses who lives within the latter area testified he and a number of other persons petitioned the City for water service and fire protection but had not received it up to the time of the trial. Some of the residential areas

and industrial tracts located outside the city limits and within the area proposed to be annexed are now supplied with gas and many of these same areas also have water supplied by the utility company. Holiday Inn located on Route K, near I-55 at the extreme western boundary of the area proposed to be annexed is furnished gas. If the annexation is consummated the company has the legal authority to furnish its services in the area proposed to be annexed and is in a position to furnish its services where it is economically feasible.

The company furnishes the electric power to the entire City and to the area proposed to be annexed. It generates 35% of its electric power and buys the remainder from Union Electric in St. Louis.

MISCELLANEOUS MUNICIPAL SERVICES AND DATA. It was pointed out at the beginning of this opinion that the City was organized under the City Manager form of government September 20, 1965. At the time of the trial the first City Manager had been appointed and his duties were to begin January 1, 1966.

Introduced in evidence was the City's codified ordinances which provided for and regulated the City's officers, administrative affairs, the Police and Fire Departments, Health, Milk, Food, Restaurants, Animals, Garbage, Streets and Sidewalks, Parks, Airport, Cemeteries, Planning and Zoning, Subdivision, Building, Electrical, Plumbing, Gas and Fire Codes, Trailers, License Tax, Liquors, and various traffic and municipal offenses. The City is divided into fourteen political wards which can be extended to accommodate the area to be annexed.

The City's Chief Engineer has been in that department for 35 years and has a staff of four employees who perform general engineering services for the City.

The City has a Police Judge and a staff of two attorneys who perform required legal services. A City Clerk of long tenure is employed with a staff of three assistants

together with a City Treasurer and City Assessor. The City also has a Building Inspector, Plumbing Inspector and Electrical Inspector and testimony indicated that these persons were able to carry out their functions in the area proposed to be annexed.

There are a number of boards staffed by citizens who serve without pay. Some have heretofore been referred to. The boards are: a five member Airport Board, nine member Library Board, ten member Planning and Zoning Board, the Civil Rights Board, and Park Advisory Board. Testimony indicated that these boards and their personnel could carry out the functions required in the area to be annexed.

The City also operates and owns two cemeteries within the present city limits. The City has a Municipal Band that performs each week during summer and on special occasions during the year. The band is supported by revenue from the tax dollar.

CITY FINANCES. The City operates on a fiscal year basis from July 1st to the end of the following June. The testimony of one of the City Councilmen, supported by an audit of the fiscal operation beginning July 1, 1964, and ending June 30, 1965 and the budget for the fiscal year of 1965–1966, shows that the surplus of the City on July 1, 1964 was $328,284.75 and on June 30, 1965 was $286,076.60. This showed an operating deficit for the period of $42,208.15. The budget showed the anticipated revenue for the fiscal year 1965–1966 to be $1,247,033.52 and the estimated expenditures at $1,264,321.27 making a deficit of approximately $17,000.00 or an anticipated surplus on June 30, 1966 of $269,076.60. The City Councilman testified that this should be a fair start toward expanding the necessary facilities to meet the needs of servicing the annexed area.

The 1958 tax levy was $1.28 on each one hundred dollar of assessed valuation and in 1965 the levy was $1.30 representing an increase of .02 in seven years. The assessed valuation for the City for the 1965–1966 fiscal year is $41,841,040.00. This represents a $2,000,000.00 increase over the previous fiscal year. The Councilman who had charge of the finances of a substantial private business said that the financial structure of the City was very healthy.

The total bonded indebtedness of the City is $1,268,000.00 which is made up of outstanding bonds on airport improvement, park improvement and sewage system. Testimony indicated that under the existing tax structure the City is in a financial position to retire these bonds when due or called.

A long range professional study is underway by Bartholomew & Associates for the proper development of the Cape Girardeau area.

AREAS AND EXTENT OF GROWTH SINCE LAST ANNEXATION. As heretofore noted the last extension of the city limits was on June 8, 1958 when approximately 1800 acres of land were added to the City. The population and growth since that time is in excess of 5000 or over 20%.

Approximately 35 streets enter or abut on the area proposed to be annexed. Presently there are about 550 residences in the area annexed in 1958 or about one per each three acres.

Supplementing the present development of industrial and commercial enterprises in the City is a corporation organized by the business men of the area and the Cape Girardeau Chamber of Commerce known as the Greater Cape Girardeau Development Corporation, which has an industrial park located near the airport about one and one-half miles south of the proposed southern line of the area to be annexed. This park originally consisted of 120 acres totally owned by the corporation and at the time of trial was occupied by four industrial units, namely, Arkansas Bests Freight System Inc., Cape Supply Company, Superior Electric Co. and Newth Rubber Co. The park has a sewage lagoon, water, utilities and rail and interstate highway services. Sixty

acres remain undisposed of. Immediately south of the industrial park is 1000 acres of land owned by the Armstrong Cork Co. which is to be developed by it for a plant site.

The retail sales in the City were $36,080,000.00 in 1958 and increased to $62,000,000.00 in 1965.

Residential development has seemed to progress at a steady pace; eight new subdivisions were added in 1959, six in 1960, three in 1961, four in 1962, four in 1963, four in 1964, and three to the date of trial in 1965 or a total of thirty-two new subdivisions developed since 1959. Over one-half of these are in the area annexed in 1958. Much of this residential development has taken place along the areas of the principal roads within the City that lead to the area proposed to be annexed. These road areas have all developed to the city limits, not only residentially but also commercially. One developer of residential land indicated that he had available a year and a half supply of land and lots for development in the city limits. The Executive Vice-President of the Cape Girardeau Chamber of Commerce testified that since 1960, two hundred fifty dwelling units have been added to the existing limits per year or a total since that time of 1250 dwelling units.

There seems to be considerable undeveloped land within the city limits. In the southern part of the City, according to the knowledgeable witnesses, there appears to be approximately 700 acres plus of undeveloped land. Most of this land is held by family estates and interests who do not wish to sell at any price and those who might sell are asking $5000 or more per acre. A real estate agent testified he could sell two hundred or more acres of land held by one of the families in the southern part of the City for $3500 to $5000 per acre but the family would not sell. A land developer within the City testified that when raw land is priced in excess of $2000 per acre it is impractical to develop it for residential purposes, pointing out the cost of development is $4000 to $4500 per acre. He said there was very little land in existing city limits available for the price of $2000 per acre. In the north and western part of the City there are approximately 600 acres of undeveloped land. Some of this is owned by the public school system and other lands belong to the Southeast Missouri State College. Eighty acres of the above acreage is not practical for residential development because it is subject to flooding from a nearby creek. A considerable portion of this acreage is not for sale at any price. In addition to the above acreage there are some vacant lots in existing subdivisions.

THE AREA TO BE ANNEXED. The area proposed to be annexed is bounded on the south by the St. Louis-San Francisco Railroad, on the west by I–55 and on the north by an irregular shaped line following roads, section lines and a portion of the present city limits. Witnesses testified that the area includes about six, seven or eight square miles. Approximately one-fifth of the area is developed with residences and commercial and industrial enterprises. The aerial map of this area shows that most of this development has taken place along the roads that traverse the area. There are three platted residential areas that constitute about one-tenth of the area to be annexed. The area has a population of 1004 persons and contains 251 residences, 23 mobile homes, an apartment complex containing twenty units, 32 miscellaneous commercial establishments, 2 churches, 2 schools, 3 parks and 2 cemeteries. A fifty or sixty acre tract was sold recently to the Marquette Cement Company and Federal Materials Company for a million dollars. This was formerly farm land and contained rock and minerals. The land had a farm value of $250 per acre. Some of this land sold for $43,560 an acre.

The extreme northeast part of the area consists of a one owner farm, an eighteen hole private golf course and country club, and a wild life area owned by the Southeast Missouri State College. The residential

and commercial developments throughout the area, as said, are principally along the roads but are well scattered throughout the entire area.

At the time of trial there were plans underway for residential and commercial expansion in the proposed area. Near Highway 61, in the south part of the area, a major shoe concern is considering a site for industrial purposes.

As heretofore pointed out, between the north and south intersection of U. S. 61 and I–55, Missouri Route K, also known as the Gordonville Road, passes over I–55 and connects with I–55 by an interchange immediately west of the City. On Route K, close to the interchange, is Holiday Inn Motel. Near the Holiday Inn the St. Francis Sisters, who have owned and operated a hospital in Cape Girardeau for eighty years, have purchased a site of twenty acres for $85,000 for a future hospital. The hospital will have 300 beds and will cost $15,000,000. The future hospital will have a sewage problem as the Public Health Department will not allow the hospital use of a sewage lagoon. There must be approved city sewage facilities available before the construction can start. It appears that if the annexation fails the hospital plans will not progress. There was testimony showing that sewage could be provided that would have an out-fall south and east of the hospital site or with a lift station the sewer lines could pass directly east to existing lines. The City Engineer in his testimony concerning the aforesaid sewage problem testified to the cost to property owners in connection with sewers that had been recently completed in a district within the City designated as Sewer District Number 12AA. This sewer system was connected with the existing sewers of the City. He estimated in this district the trunk and lateral assessment costs would be 3.6¢ per square foot throughout the entire district. He did not think that it would be economically feasible to attempt to bring sewage trunk lines from the City

to the hospital area. He did not give any testimony as to the costs of a sewer that could have an out-fall south and east of the hospital site.

The Lutheran Church of America has purchased eight acres of land for a church in the northwest portion of the area to be annexed. This purchase was made following an extensive survey to determine the growth pattern of the City.

One of the witnesses engaged in the real estate business testified that many of the areas within the proposed annexation, which are now being used for farming, would lend themselves to real fine residential type of development. He said several fine homes in the $30,000 or $40,000 class were being built in the northwest area and described other properties containing residences with values in the $70,000 to $80,000 class. In describing one of the areas the witness testified to the existence of a drive-in theatre, a trailer court, an old motel, a place that distributes Stag beer and an antique shop in the area, pointing out these things to show what happens when there is no zoning control and he said these properties are close to some of the expensive homes just mentioned. The same witness said that the lack of zoning laws outside the corporate limits of the City was one of the moving factors in extending the corporate limits in 1958. He gave this as a need for the present annexation in order to provide an orderly development of the area.

In the area to be annexed most of the developed properties have gas, water and electricity from the local utility. They do not have sewer facilities but use septic tanks and they do not have fire and police protection.

In much of the area to be annexed the costs of undeveloped land has increased from farm land prices of $175 to $250 per acre to $2000 up to $5000 per acre.

George Penzel, Civil Engineer, for the Cape Girardeau Special Road District

described the scope of operation of the district and said that it maintains roads and a few parks within the district's boundary line, builds roads and bridges and maintains bridges. The revenue is obtained from a Special Road and Bridge Tax levied on the property within the district's boundary line and the district is authorized by law to and has been spending 25% of its annual budget of $120,000 for street and road purposes within the City of Cape Girardeau. A circumferential roadway is being planned that parallels I–55. This roadway would connect north U.S. 61 with south U.S. 61. The road will be built by the district and right-of-way will be obtained by it.

S. A. Armstrong, one of the defendants, testified that the installation of sewers would not benefit his land as a farm but admitted that in time it would increase the value of his land for commercial purposes and even residential buildings. He admitted that there is a small development of commercial and residential properties next to him. When asked if his land was worth more than the prevailing rates for farm land he said, "that's the consensus of opinion, I'd say, yes." He admitted that the vacant land is more valuable than the price for which good farms are normally being sold today as farm land. Another defendant would not say he was against the annexation but seemed to indicate that he was for it. He thought that annexation within the area and the development that would follow would make the land a little more valuable.

The City in answer to interrogatories said that it could furnish normal municipal services to the people in the area to be annexed immediately for most of these services and the other services whenever the people are willing to pay for those services extended at the cost of property owners, such as street paving.

■ We first consider the contention of defendants that the City failed to show by its evidence that defendants and interve-nors adequately represented the persons to be affected by the proposed annexation. We have pointed out heretofore that the petition of the City alleged that the defendants were joined as representatives of a class of all the inhabitants of said unincorporated area and that the defendants named in the original petition had been fairly chosen and adequately and fairly represent the whole class in that said defendants are all owners of real estate within the area proposed to be annexed. The original defendants and intervenors in their answer admitted these allegations in plaintiff's petition. By so doing defendants and intervenors obviated the need of proof of this allegation by the City. As we said in the case of City of Creve Coeur v. Huddleston, Mo.App., 405 S.W.2d 536, 540, the issue raised by the allegation dropped out of the case. There is nothing for review. Civil Rule 83.13(a) (b), V.A.M.R.

In another contention defendants claim that "Plaintiff's Petition referred to in the Decree contains an unintelligible description (of the area proposed to be annexed) contrary to the intention shown by the testimony." (Matter in parenthesis ours.) The description of the area in the petition is lengthy and inasmuch as defendants' complaint is directed to the words "to the end of said east-bound lane" (of U.S. Route 61) appearing in the last part of the first call in said description, we state only so much of the description we deem necessary to an understanding and disposition of defendants' complaint. This part of the description in the petition is as follows:

"Beginning at a point on the East right-of-way line of Interstate Route I–55, said point being at right angles to station 1021 + 67 on the centerline median of said highway, said point also being 500 feet measured at right angles from the east-bound lane of U.S. Route 61; thence on a line parallel to and 500 feet from said centerline of the east-bound lane of said U.S. Route 61 to the end of said east-bound lane; thence continuing on a line parallel to and 500 feet from the center-

line of U.S. Route 61 to the south line of Section 23, Twp. 31 N, Rge. 13 E.; * * *."

Defendants state that U.S. Route 61 is a Federal Aid Highway running from the Canadian border to the Gulf of Mexico. They contend that "The description in the Petition therefore follows 500 feet from this east-bound lane from the beginning point to the end of the highway somewhere near the Gulf of Mexico—at least outside the State of Missouri." Defendants admit that the engineer of the Cape Special Road District testified that he prepared the description and that he intended to describe the first course as running to the east end of the intersection complex but defendants contend that it does not so read. This witness in his testimony described each call of the legal description of the area to be annexed as described in the petition. As this witness described each call of the description he identified the various points referred to in the description on an aerial photograph of the City and the area proposed to be annexed. He described the large complex interchange where I–55 intersects with U.S. Route 61 and testified that approximately 2500 to 3000 feet on each side of I–55, U.S. 61, which beyond those points is a two lane highway with eastbound and westbound lanes adjoining, becomes a separated highway where one lane is for eastbound traffic only and the other lane is for westbound traffic only with a median strip dividing the two lanes of traffic. He was not sure whether the eastbound lane was identical with the entire U.S. 61 before they divided the pavement. He thought the eastbound lane had been widened and reconstructed and that the grade lines had been changed. He said in preparing the description, when referring "to the end of said east-bound lane," he meant the eastbound lane where the highway was separated and meant for the description to end where the two slabs again intersected. He said that where the two slabs come together in his opinion, technically, that is where the eastbound lane ends. However, more pertinent was his testimony that the State of Missouri Highway Department plans identify the divided lanes of U.S. No. 61 as the westbound lane and the eastbound lane at the point where U.S. 61 intersects with I–55 and these plans identify the end of the eastbound lane at the point where the east and westbound lanes come together east of the interchange with I–55. The engineer having identified the description with a landmark, namely, where the two slabs intersect east of the interchange with I–55 it becomes more pertinent when the second call of the description is also located by landmarks. The second call is traced 500 feet from the centerline of U.S. No. 61 to its intersection with a section line with the Township and Range described. We think with these landmarks positively identified and especially with the State of Missouri Highway Department plans establishing the end of the eastbound lane at the point where the east and westbound lanes come together east of the interchange with I–55, the description is sufficiently clear. The description in the petition did not prevent the defendants from knowing the correct area proposed to be annexed. No doubt the description in this connection might have been more precise but we do not believe it to be of such serious consequence as to invalidate the City's resolution to annex. State ex rel. Musser v. Birch, 186 Mo. 205, 85 S.W. 361, Waller v. City of Macon, Mo. App., 277 S.W.2d 886. This contention is ruled against defendants.

The two primary contentions urged by defendants, which we discuss together, are that the trial court erred in finding the proposed annexation reasonable and in finding it necessary to the proper development of the City.

The instant declaratory judgment action was brought following the adoption by the Council of the City of a resolution to annex the unincorporated area of land, heretofore described, adjacent to said City and authorizing and directing the City Attorney of said City to file this action.

The applicable rules, guidelines and some of the factors to be looked for in determining the reasonableness of the annexation and the necessity of the annexation to the proper development of the City have been stated many times in the appellate decisions of this state.

■ The City has the burden to prove the elements required by Section 71.015, supra (the Sawyer Act); those elements include proof that (1) the annexation is reasonable and necessary to the proper development of said City; (2) the ability of said City to furnish normal municipal services of said City to the unincorporated area within a reasonable time. City of Olivette v. Graeler, Mo., 369 S.W.2d 85, l. c. 93; City of St. Joseph v. Hankinson, Mo., 312 S.W.2d 4, 10; City of St. Ann v. Buschard, Mo.App., 356 S.W.2d 567, l. c. 575.

■ In reviewing this annexation proceeding we are essentially passing judicially on a legislative act. The extent and limits of our review have been stated recently by the Supreme Court in the case of McDonnell Aircraft Corporation v. City of Berkeley, Mo., 367 S.W.2d 498 at l. c. 502, where the court said,

"In City of St. Joseph v. Hankinson, Mo. Sup., 312 S.W.2d 4, 8, we pointed out that, in reviewing the validity of annexation cases 'it has been the universal rule that the court does not, in any sense, substitute its discretion or judgment as to the advisability or propriety of the annexation for that of the legislative body of the city, and that it does not review the legislative discretion; its consideration of "reasonableness" is confined to a determination of whether there exists a sufficient showing of reasonableness to make that question, at the least, a fairly debatable one; if there is such, then the discretion of the legislative body is conclusive.' We therein further stated: 'The function of our courts, historically, has been merely to determine,

in the light of these principles, whether the exercise of the legislative powers has been arbitrary and clearly unreasonable. * * * Only to this extent do our courts consider the reasonableness of an annexation.' (For discussion of the test of a fairly debatable question see State ex inf. Mallett ex rel. Womack v. City of Joplin, 332 Mo. 1193, 62 S.W.2d 393, 398; * * *.)"

As said before it is seen that we are reviewing and passing upon in a purely judicial manner the validity of an act of the legislative body of the City of Cape Girardeau.

■ We said in the case of Dressel v. City of Crestwood, Mo.App., 257 S.W.2d 236, l. c. 248:

"We cannot substitute our judgment for that of the city officials, but must confine our inquiry to the question whether, upon the facts disclosed, said officials could reasonably have found that the annexation was necessary, proper and reasonable; and, since it was within the statutory power of the Board of Aldermen to provide by ordinance for the extension of the city limits, the ordinance in question is presumed to be reasonable and valid until that presumption is overthrown by evidence which clearly shows the contrary. * * * Where the reasonableness of an ordinance is doubtful, the doubt must be resolved in favor of the ordinance. * * *"

As we have pointed out the City has the burden to show that the annexation is necessary as well as reasonable. In this connection the Supreme Court has said in the case of City of St. Joseph v. Hankinson, Mo.Sup., 312 S.W.2d 4, l. c. 9:

"The word 'necessary', as used in § 71.015, or the 'necessity' of annexation, is likewise considered in the cases. In annexation cases, generally, the necessity actually seems to become a part of the 'reasonableness'. State ex inf. Major v. Kansas City, Banc, 233 Mo. 162, 134

S.W. 1007, loc. cit. 1026; State ex inf. Taylor ex rel. Kansas City v. North Kansas City, supra [360 Mo. 374, 228 S.W.2d 762]. In fact, the element of need by the town or city is one of the primary elements listed in our cases as a test of 'reasonableness.' * * * And the courts do not attempt to usurp the legislative prerogative of determining the question of necessity."

While the cases hold that the city has the burden to prove the two separate elements, namely, reasonableness of the annexation and necessity to the proper development of the city, they have been held to be closely related concepts. City of Olivette v. Graeler, Mo., 369 S.W.2d 85, 1. c. 93.

█ The decisions of our appellate courts present many tests to determine the reasonableness of the annexation. All the tests proposed need not be met by the city in order to sustain its burden of proof. Each case is a separate problem to be considered on all its facts. City of St. Joseph v. Hankinson, supra. A case of reasonableness is made where it appears that the land annexed is so situated as to be adaptable to urban purposes and necessary or convenient to a reasonable exercise of the city government. Dressel v. City of Crestwood, supra.

█ We think the evidence when considered in its entirety supports the trial court's findings and decree that the annexation is reasonable and necessary. There are some areas in the testimony that gave us momentary concern, namely, large areas of vacant land in the City and the size of the area annexed. However, we think the evidence shows a sufficient explanation and excuse for the vacant areas in the City and the cause should not be chargeable to the City. While the area to be annexed seems large in size, upon a study of the geographical situation it now appears that the natural western boundary should be the Interstate Route I-55. Carrying the western

boundary to this route does cause a large area to be annexed but upon more mature reflection this route appears to be a natural boundary for the western limits of the proposed area. These two concerns we have mentioned do not demonstrate an arbitrary exercise of the legislative power of the City and at most can only make the question of reasonableness a fairly debatable one and as said in the cases, if the question is a fairly debatable one the discretion of the legislative body is conclusive.

We do not wish to burden this opinion with an enumeration of the many tests cited in the cases to determine the reasonableness of the annexation. We think our summation of facts, other than those that caused us concern, heretofore mentioned, sufficiently bespeak the reasonableness and the necessity of the annexation. What we propose to point out are some of the facts that demonstrate sufficiently the need and reasonableness of the annexation. We think these facts are sufficient to meet many of the tests suggested in the cases.

It is difficult to formalize a rule as to when a City should move to extend its boundaries and how far those boundaries should be extended. Obviously, the extension of a city's boundaries should be done infrequently and as a consequence, when it is done, the city should be permitted to look into the future and acquire sufficient land to take care of its development for a reasonable number of years to come.

The present boundaries of the City are irregular, especially on the west and south borders; whereas, under the proposed annexation the west and south boundaries will be regular and straight, a desirable thing. However, the north boundary will continue to follow an irregular line. As the record indicates the Mississippi River is a constant boundary on the east.

Growth in all areas of a community's activities is a significant factor looked for

in a determination of whether annexation is reasonable and necessary. As the most important unit of society, the family, grows, the home must be expanded. So it is with a city that grows. Cape Girardeau has grown in population since 1910, from 8475 people to over 30,000, including graduate students of the college within its boundaries. Since the last annexation in 1958 the population has increased by 5000 people or over 20%. The record shows that this population growth has not been sudden, but has been a steady growth through the years. Its commercial and industrial development, demonstrated in the number of retail and wholesale establishments and industrial firms, which number seems large in comparison to the population of the City, together with its extensive banking and savings and loan facilities, indicate very extensive growth in these areas. Usually commercial and industrial expansion is one of the main factors justifying annexation of new territory and so it seems to be in the instant case. We think this is shown in the organization of a development corporation for commercial and industrial expansion. While it is true that this corporation has developed an industrial park outside of the limits of the City and the proposed area to be annexed, its development clearly indicates that the business men see the need for additional areas for industrial and commercial expansion. While the record does not show any figures indicating the percentage of industrial increase over the past we think a good barometer is the evidence that shows the retail sales of the City have increased since the last annexation in 1958 from approximately $36,000,000.00 to $62,000,000.00 in 1965, an increase of approximately 75%. In the general area are large industrial developments by the Armstrong Cork Company, Marquette Cement Company, and Federal Materials Company. There can be little doubt that these industries and others not mentioned have been attracted to this area by the location of the City on the banks of the Mississippi River, by its water transportation facilities, its ample access roads close to the main highways, U.S. 61 and I-55, and its railroads and airport facilities. With these new industrial developments come demands for new schools, fire protection, police protection, and other municipal services. Since the last annexation real estate development has increased at a steady pace. The percentage of home ownership in the City is large, namely, 82% and the evidence shows that presently there are twenty housing developments underway. The knowledgeable witnesses indicated that when these housing developments are completed it will be necessary to look elsewhere for further residential developments. Defendants point to the large vacant areas remaining in the City but it is clear from the testimony of the witnesses that unless the owners of these large family estates and interests change their minds and cease withholding their properties from sale or those who do have them on the market make the land available at reasonable prices these areas will not be available for commercial or residential properties. The conditions that make these properties unavailable as commercial or residential properties should not be a hindrance to the City in its move for annexation of additional land. These are conditions and circumstances beyond the control of the City. When the areas owned by these family estates and interests are excluded there is not an unusual amount of land left within the City for further residential or commercial expansion. One of the City's witnesses, a real estate man who seemed to have an extensive knowledge of the entire City and area proposed to be annexed, pointed out that many of the areas within the proposed annexation would lend themselves to fine residential development. A significant portion of this witness' testimony that supports the need for annexation, both by the City and the area to be annexed, is that which pointed to the development of some fine homes which were surrounded by

businesses and enterprises that deteriorated the area and the value of these homes. This testimony points to the need for zoning control, which control is important, not only to the City and its future but to the area proposed to be annexed and its future. This uncontrolled building process taking place near the present limits of the City unless regulated and controlled by zoning laws will have a deteriorating effect, not only on the area to be annexed but on the City itself. The City should have a part in its orderly growth and zoning. City of St. Joseph v. Hankinson, 312 S.W.2d 1. c. 18. The early annexation of this area will help its residential, commercial and industrial development along systematical and, therefore, economical lines.

We think the evidence demonstrates clearly that virtually all of the area to be annexed is so situated as to be adaptable to urban purposes. While it is true that a large part of the land is vacant and some of it is now used for agricultural purposes, it has a much greater value than agricultural land and this is because of its proximity to the City and its adaptability for city purposes. The evidence shows that the land in the area proposed to be annexed has increased from farm land prices of $175—$250 an acre to $2000 up to $5000 an acre. One of the defendants in his testimony admitted that the vacant land is more valuable than the price for which good farms are normally sold today as farm land. The weight of the evidence is that the value of this land for city development is far in excess of its value as agricultural land. The reasons for these urban values in this land are apparent; its proximity to the City makes accessible to the residents of the areas the roads and streets that run in and out of the City, makes available to said residents all of the City's facilities such as hospitals, transportation, schools, library, parks, employment and other facilities we need not enumerate. Defendants contend that the principal development in the area to be

annexed is along the roads. This is a natural development because business men and residents seek adequate transportation facilities when locating their businesses and residences. As locations along the roads are depleted no doubt additional roads and streets will be developed to provide for further expansion. Without question the high value of this land is because of its proximity to the City and its facilities and because of its adaptability for city purposes. Frankly, there was no evidence to the contrary offered by the defendants. The Supreme Court in the case of the City of St. Joseph v. Hankinson, supra, l. c. 19, quoting from the case of State ex inf. Major v. Kansas City, Banc, 233 Mo. 162, 134 S.W. 1007 at l. c. 1023 said: " * * * If land near a city is being held for prices far above any rural use, and men in that city are willing to pay for it prices far in excess of any rural use, that land is as fairly within the future development of the city as the judgment of those who are most interested can place it." We find that the land proposed to be annexed is so situated as to be adaptable to urban purposes; that the value of the land clearly characterizes it as urban property and that it is necessary and convenient to a reasonable exercise of the City government.

Further, we think it reasonable and necessary that the City annex this area because, as the evidence shows, there are three interchanges on I–55 that would carry traffic to and from the City over the roads and highways that connect with these interchanges and as the record discloses there is an outlet by means of a toll bridge across the Mississippi River that leads to important state highways in the State of Illinois. As the evidence discloses, a project is underway to connect Illinois traffic with I–55 which means traffic to and from I–55 will have to traverse the City. Therefore, it is important that the City have control of traffic in the entire area.

There are additional reasons why the proposed annexation is reasonable from the point of view of the residents of the area to be annexed. The evidence shows that the schools in the various districts within the area to be annexed are operating at minimum standards. The districts have no high schools and the evidence points to a real need for City schools in the area where many of the children in that area are now attending City schools. The school system of the City seems well developed and adequate with a favorable tax levy to support that system and as we have pointed out, it is obvious from the record that the area proposed to be annexed is in need of better school facilities. This area is in need of fire and police protection. While no doubt this area has the protection of the Sheriff's office, under ordinary circumstances this office cannot afford to furnish all the facilities and protection of a City Police Department. The record is without evidence to show that the area to be annexed has any fire protection. It does show that the City furnishes no fire protection to the area at the present time. We think it important to the people of this area that they have the facilities of a modern fire department. As a result of their lack of fire protection facilities they now experience the highest rate of insurance, which will automatically be reduced from a rate of ten to nine upon annexation and will be further reduced upon the installation of modern fire equipment and water hydrants. We have pointed out the dire need for a uniform system of zoning for the properties of this area.

As pointed out by the City, one of the most pressing needs in the area to be annexed is that of an adequate sewer system, especially for the areas in which development has taken place and contemplated development is planned. It is in this connection that the defendants lodge their principal complaint to the annexation. The complaint has a conjectural basis in that defendants surmise that the City, if the area is annexed, would attempt to provide sewers for the Holiday Inn and the proposed St. Francis Hospital. They contend that if a sewer trunk line is built for them and connected with the City's present trunk line that it will entail a prohibitive cost and amount to confiscation of their property. It is true that the City's engineer testified that this was one solution for providing sewers for the Holiday Inn and proposed St. Francis Hospital. He also testified to a plan that would extend the sewer line east with a lift station to connect with existing sewers. In this last plan the sewer cost would not be taxed against those who complained. No doubt there are other alternatives in addition to those given in the testimony as to the manner of extending sewers to the two properties referred to. In this present age somewhat similar projects have been known to be subsidized by the State or Federal Government. It was acknowledged by the defendants' witnesses that the installation of sewers would increase the value of their properties. Of this there can be no doubt. Sewers are a necessary utility in this modern age. They improve sanitation and therefore combat disease and pestilence. When the sewers are installed the area will have the facilities of the sewage disposal plant now being operated by the City, which plant, according to the testimony, is sufficient in capacity to accommodate an additional population of 20,000 people. Another sanitation benefit available will be the service now used by the City that gathers the garbage of the City. There is no evidence that such a service has been extended to the area to be annexed and the Mayor of the City testified that this service could be extended to the area to be annexed. At this point it is well to observe that those charged with the responsibility of building and developing the hospital referred to have clearly indicated that the area has expanded residentially and commercially to such an extent as to afford the erection of a $15,000,000.00 hospital. We see nothing in the complaint of the defendants about the cost of installing the sewers that would detract from the reasonableness and the need of this annexation.

Much more could be said that would demonstrate the reasonableness and the need of the annexation. However, we think the factors we have found and pointed out are sufficient to show that the reasonableness of the proposed annexation was at least a debatable question. We therefore hold that the City sustained its burden to show that the annexation was reasonable and was necessary for the proper development of the City.

The final point of defendants we take up for consideration is the contention that the trial court erred in finding that the City is able to furnish the normal municipal services of the City to the annexed area within a reasonable time. We see no need to enter into an extended discussion in connection with this contention. We point out that defendants produced no evidence to controvert the City's evidence in this regard. The evidence offered by the witnesses for the City who are in a position to know the potential ability of their various departments to furnish the normal services of the City to the area to be annexed was ample and reasonable. We think their testimony demonstrated the ability of the City to furnish the normal municipal services of the City to the annexed area within a reasonable time after the annexation becomes effective. Their testimony showed ability to provide the fire and police protection, health and sanitation regulation and control, proper zoning regulation, sewers, installation, repair and maintenance of streets, garbage and trash disposal, library and recreational facilities. We think the evidence demonstrates that the City's financial position is sound and from this standpoint it has the ability to furnish these municipal services when required. The evidence shows that the public school system, not under the control of the City, has the ability to provide its services to the area annexed, if it comes within its jurisdiction. Water, gas and electric power, provided by a private utility, is now being furnished to parts of the area. We are confident the company has the ability to service the entire area to be annexed. Any further discussion of this contention would merely involve a reiteration of the evidence which we have summarized. We hold that the City has discharged its burden to show the ability of the City to furnish the normal municipal services of said City to the area proposed to be annexed within a reasonable time after said annexation is to become effective.

The trial court's declaratory judgment and decree authorizing the annexation should be affirmed. It is so ordered.

ANDERSON, P. J., and WOLFE, J., concur.